Evans PAUL, Jean Auguste Mesyeux, Marino Etienne, Gerald Emile Brun, Serge Gilles, and Fernand Gerard Laforest, Plaintiffs,

v.

Prosper AVRIL, Defendant.

No. 91–399–CIV.

United States District Court,
S.D. Florida.

July 1, 1994.

Matthew J. Chachére, Beth Stephens, Michael Ratner, Jennifer Green, Center for Constitutional Rights, New York City, Ira Kurzban, Kurzban, Kurzban & Weinger, P.A., Miami, FL (Harold Hongjukoh, Ronald C. Slye, Intern. Human Rights Clinic, New Haven, CT), for plaintiffs.

Stephen A. Papy (Richard A. Hibey, Gordon A. Coffee, Anderson, Hibey, Nauheim & Blair), Washington, DC, for defendants.

### FINAL JUDGMENT GRANTING DEFAULT AND AWARDING DAMAGES

FERGUSON, District Judge.

This case involves the claims of six prominent Haitian citizens, opponents of the ruling military regime, for damages suffered by torture and false imprisonment directed by Prosper Avril who was then military ruler.[1] The torts were committed in Haiti in 1989 and 1990 during the defendant's reign as head of government.

Plaintiffs, all citizens of Haiti, sought relief under the Alien Tort Statute, 28 U.S.C.A. § 1350, which provides district courts with original jurisdiction over civil actions brought by aliens for torts committed in violation of the law of nations or a treaty of the United States. The summons and complaint were served on defendant Avril in his home in Miami Lakes, Florida, on February 28, 1991. Defendant's motion to dismiss the complaint was denied by this Court in 1993, in *Paul v. Avril*, 812 F.Supp. 207 (S.D.Fla.1993). After that adverse ruling, the defendant declined to participate further in the case. At the hearing to determine the proper amount of damages to be awarded in this case, no defense was presented.

All six plaintiffs filed extensive documentary evidence in support of their claims for damages, including affidavits and medical records. The declarations of three experts were presented, including the exiled Chief Justice of the Haitian Supreme Court, an expert on the command structure of the Haitian military and police, and an expert on the human rights situation in Haiti. Oral testimony presented at the hearing included the testimony of plaintiff Fernand Gerard Laforest and human rights expert William G. O'Neil. Based on the documentary and testi-

1. An order granting Plaintiffs' Motion for Default pursuant to Federal Rule of Civil Procedure 37(b) was entered by this court on March 7, 1994, in accordance with a Report and Recommendation of Magistrate Judge Peter R. Palermo, after the defendant failed repeatedly to comply with a court order requiring him to appear for deposition. The cause came before the Court on June 6, 1994 for a hearing on damages.

monial evidence, the Court makes the following factual findings:

1. Plaintiff Evans Paul is currently the elected mayor of the capital of Haiti, Port-au-Prince, although he has been prevented from performing the duties of the office since the 1991 military coup. A long-time opponent of military rule, in 1986 he helped organize a coalition of grassroots organizations which protested continuing military rule and human rights violations.

2. Plaintiff Jean Auguste Mesyeux, who currently lives in exile in Canada, was a co-founder of Haiti's largest trade union, the Autonomous Federation of Haitian Workers. As the executive secretary, he was actively involved in organizing opposition to military rule during the regime of defendant Avril.

3. Plaintiff Marino Etienne currently lives in exile in Paris, France. A former sergeant in the Presidential Guard, Etienne was the leader of a group of former soldiers committed to democratic reform in Haiti.

4. On October 30, 1989, plaintiffs Paul, Mesyeux and Etienne appeared at a televised press conference where they called for a month-long nonviolent protest to demand democratic reforms from the government of General Avril. They participated in the press conference as leaders of the Rassemblement National, a coalition of organizations supporting democratic change.

5. On November 1, 1989, Paul, Mesyeux and Etienne were lured to a meeting at the home of a member of the military. Soldiers from the Presidential guard and other military units detained the plaintiffs without warrant or charge. The soldiers pushed the plaintiffs to the ground, beat them with truncheons, boots and guns, and threatened to kill them. They were thrown into a jeep and taken to Police Headquarters.

6. At Police Headquarters, the beatings of plaintiffs Paul, Mesyeux, and Etienne continued. Soldiers used nightsticks to beat their backs, kidneys and the soles of their feet. Their testicles were pulled and squeezed. When they fainted from the pain, the soldiers revived them by singeing the hair in their nostrils with fire from cigarette lighters.

7. High-ranking military officials interrogated Paul, Mesyeux, and Etienne as they were beaten with iron bars, rifle butts, helmets and fists. Etienne was forced into the "djak" position, in which his hands and feet were bound and his body was suspended from a pole.

8. On November 2, 1989, Paul, Mesyeux, and Etienne were forced to appear on television while false charges were read against them. They were then returned to prison where they were detained for three months. Medical treatment was denied for one week and administered only sporadically and inadequately thereafter.

9. As a result of his ordeal, Evans Paul suffered broken ribs, a herniated disc, a perforated lung, a crushed hip, a fractured back, and pain and inflammation in his genitals and right ear. He was confined to a wheelchair for a year and continues to walk with a limp. He can no longer run or play with his children, suffers from migraines and pain in his eyes, hip and groin, and bears scars on his scalp, back and face. Paul also suffers fear and anxiety, fatigue, and has difficulty sleeping.

10. The beatings caused Jean–Auguste Mesyeux to experience throbbing headaches and severe pain and swelling in his wrists, feet, and groin. Mesyeux's severe injuries required him to seek medical treatment in the United States in March 1990. He still suffers pain in his hips, lower back and the soles of his feet, making it impossible to stand for extended periods of time. In addition, Mesyeux's vision is now impaired and he has occasional headaches. Due to the physical ailments resulting from the torture, Mesyeux has been unable to continue working as director of the trade union.

11. Marino Etienne, as a result of the beatings, suffered a punctured eardrum, three broken fingers, recurring migraine headaches and severe injuries to his back and waist. For several weeks after the torture he was only partially conscious, and was delirious from the pain. His right arm is virtually paralyzed, as are two fingers on his right hand. He has lost hearing in his right ear and most of the sight in his right eye.

He suffers from recurring migraine headaches and pain in his kidneys and groin which makes urination painful. His psychological trauma manifests itself in terrifying flashbacks and a highly-agitated emotional state. He has incurred significant medical expenses which have limited his ability to support his wife and nine children. Etienne has been unable to find work in France because his injuries inhibit physical activity.

12. Plaintiff Gerald Emile "Aby" Brun was a leader of the opposition political movement called the party of the National Congress of Democratic Movements (KONAKOM). On January 20th, 1990, defendant Avril declared a state of siege and Brun was arbitrarily arrested and detained at a KONAKOM meeting at the Ecumenical Center for Human Rights in Port-au-Prince. At about 12:15 p.m., approximately 15 heavily-armed Presidential Guard soldiers, members of Avril's personal security detail and policemen, stormed the building shouting threats, beating people, and ordering everyone to lie down.

13. The armed men handcuffed Brun, forced him to the ground, battered his buttocks, back and kidneys with truncheons, stomped on his back, spit in his face, shouted threats and slashed his skin with broomsticks and thorny branches as neighbors watched his suffering and humiliation. The soldiers then dragged Brun through the Ecumenical Center, shoved him into a jeep, and continually beat him in the chest, arms, shoulders and hips with gun butts while the vehicle drove around the city arresting other activists. Upon arrival at Brun's home, soldiers searched his house, ransacking his belongings. Soldiers continued to hit and kick Brun in the presence of his children and stepmother.

14. Brun was then taken to a tiny cell at the Office of Investigations and Anti–Gang Services. Confined to the cell, Brun was not permitted to seek medical attention or to speak with relatives or legal counsel.

15. Later that night, Brun was transported to the National Penitentiary. The next day he was taken to Police Headquarters for a second interrogation, during which one of defendant's officers threatened to kill Brun if he did not confess to a number of fictitious crimes. He was thereupon forcibly deported to Miami without the benefit of any legal process.

16. In Miami, Brun was hospitalized for injuries stemming from his beating and torture. He temporarily lost the use of his left hand and suffered multiple contusions on his buttocks, hips and back. He also suffered severe pain in his spinal column, shoulders and neck. During his exile in the United States, Brun experienced severe psychological trauma resulting from the torture and detention. He feared for his family's safety and agonized over his forced separation from them.

17. Brun continues to suffer lingering physical and emotional injuries. He experiences sharp lower-back pain that severely restricts his movement and requires regular medical treatment. His injuries prevent him from engaging in athletic activities and he is unable to lift his children. Brun is on medication for hypertension, a condition he developed as a result of the beatings. He experiences nightmares and flashbacks of his ordeal and lives in constant anxiety for his own and his family's safety.

18. Due to his forced exile, Brun lost over $25,000 in income from his job as an architect. Since his return to Haiti, his capacity to work has been drastically curtailed due to his physical and psychological scars. The cost of medical treatment in Miami totalled between $8,000 and $10,000. Ongoing medical services have cost approximately $250 a year. In addition, medication for his high blood pressure costs approximately $100 a month. Several emergency hospital and doctor visits have cost between $5,000 and $10,-000. Other expenses stemming from his torture and forced exile include living in Miami for two months.

19. Plaintiff Gilles was the founder and leader of the Progressive National Revolutionary Haitian Party, an organization opposed to Avril's military regime. On January 20th, 1990, at around 2:00 p.m., approximately five heavily-armed members of Avril's personal security detail forcibly entered Gilles's home. The soldiers "smashed" his

face against the floor, handcuffed him, and kicked and punched him in the head, stomach and other parts of his body, as his wife and young daughters watched in horror. The armed men accused Gilles of "annoying" Avril and questioned him about his political work. During the incident, a soldier struck his torso with a heavy, marble ashtray. The soldiers ransacked Gilles's house and seized his personal papers and valuables.

20. Gilles was forced into a vehicle with other beaten prisoners, including plaintiff Brun. During a ride to the National Palace, Gilles was rendered unconscious by a sharp blow to the head. Military personnel continued to deride and insult Gilles for his political activism, threatening to send him away so that he could not interfere with Avril.

21. Upon arrival at the National Palace, Gilles was surrounded and beaten by 75 to 100 Presidential Guard soldiers. Another blow to the head ruptured his right eardrum. Gilles was then transported to the Office of Investigations and Anti–Gang Service and locked in a tiny cell with 14 or 15 other prisoners. He was released that same day after President Francois Mitterand of France and other international leaders contacted Avril to intervene on Gilles's behalf.

22. As a result of the beatings and torture of January 20th, 1990, plaintiff Gilles suffered a punctured eardrum, ripped tendons in the left shoulder, and three displaced vertebra. The ear injury caused him excruciating pain until relieved by surgery in a Paris hospital. Injuries to his stomach, back, and shoulder required two operations and many physical therapy sessions. Due to his injuries, Gilles was unable to work for three months after the beatings. He is on medication for his back injuries and finds it impossible to sit for long periods of time. His hearing remains impaired and he has experienced problems moving his left arm due to injuries to his shoulder. One year later, Gilles was diagnosed with double hepatitis caused by the beating in the region of his liver. Gilles's overall physical condition has been weakened, preventing him from playing with his children and engaging in physical activities that he once enjoyed. Gilles remains emotionally scarred by the traumatic

events of January 20th, 1990, and his doctors warn that the beatings of January 20th, 1990, may cause him other medical problems in the future. Gilles has had to pay for his operations, physical therapy, and medications, expenses which he estimates at $400,000 out of his own pocket.

23. Fernand Gerard Laforest, a physician who was engaged in rural development work, was arrested without cause or explanation, along with a female companion, on January 20th, 1990, at about 12:30 p.m. Soldiers stripped Laforest of possessions on his person and broke into and searched his house. Laforest was interrogated for about three hours at the Office of Investigations and Anti–Gang Service. After a call from the Presidential Palace, Laforest and his companion were transported to Metropolitan Police Headquarters in Port-au-Prince.

24. At Police headquarters, Laforest was beaten and interrogated by Avril's officers and soldiers from about 8:00 p.m. until about 4:00 a.m. Soldiers battered his eyes, ears, and head with wooden bats and metal rods. Each time Laforest attempted to raise himself off the floor, soldiers threw him down, kicking his body with their heavy boots. One soldier plucked out his eyelashes and hairs from his beard. At one point, Laforest's female friend was brought into the room and beaten in his presence in order to coerce a confession from Laforest to a murder. He was forced into tight plastic handcuffs and placed in the "djak" position, his hands and feet tied together, with vulnerable parts of the body exposed. In the beatings which followed he lost consciousness several times.

25. When Laforest again refused to confess, he was confined, unconscious, to a small cell at the Investigations and Anti–Gang Service. On regaining consciousness in the afternoon of January 21st, 1990, Laforest's head was swollen and he had difficulty breathing. Despite his severe injuries, Laforest was refused food for four days and was denied medical treatment for eight days.

26. On January 21st, 1990, the national media broadcast news of Laforest's arrest, further humiliating the plaintiff. On the night of January 22nd, 1990, Laforest was

transferred to the prison in Petionville. Six day later, he was finally permitted to see a doctor.

27. On February 2nd, 1990, Laforest was transferred to the National Penitentiary where he was forbidden from communicating with fellow inmates. Laforest was released on February 7th, 1990, as part of the general amnesty declared by Avril. Following his release, Laforest remained in danger and was forced to go into hiding for two weeks, during which time he could not obtain medical care.

28. As a result of his ordeal, Laforest suffered broken ribs, a perforated eardrum, a detached retina, severe knee, joint, and back injuries, digestive problems, an inguinal hernia, hypertension, and severe migraines caused by a subdural hematoma, as well as various scars on his head. After his release, Laforest experienced severe nausea and severe pain in movement. For the acute migraine headaches and persistent dizziness he sought medical treatment in the United States where intercranial surgery was performed to remove fluid from the brain. His vision is permanently impaired, is sometimes distorted, and his eyes tire easily. Laforest's ear injury has resulted in painful pressure, a 40% hearing loss in his right ear, and a 15% loss in his left. He is unable to engage in any of the physical activities he once enjoyed and his ability to work has been drastically reduced. Laforest continues to suffer from severe migraines. As a result of lower back and joint pains, he finds it difficult to climb stairs. He continues to have nightmares and flashbacks of his torture and confinement. Laforest estimates his past lost income to be $200,000 and his future loss of income to be $1,000,000. In addition, he estimates his past medical expenses for treatment of his injuries arising out of the torture to be approximately $50,000, as well as substantial travel and living expenses in connection with his trips to the United States and France for treatment, totalling at least $10,000. He estimates that his future medical expenses in connection thereto will be $100,000.

29. Because of his years as a sergeant in the Presidential Guard, Etienne recognized the soldiers and officers who detained and tortured plaintiffs. On three different occasions on the day of their arrest, Etienne heard his captors state that the arrests had been ordered by defendant Avril. One of the arresting soldiers spoke with defendant Avril by walkie-talkie during the ordeal. At one point the soldier placed the device close to Etienne's ear so he could confirm for himself that the voice on the other end was that of defendant Avril.

■ 30. Defendant Avril bears personal responsibility for a systematic pattern of egregious human rights abuses in Haiti during his military rule of September 1988 until March 1990. He also bears personal responsibility for the interrogation and torture of each of the plaintiffs in this case. All of the soldiers and officers in the Haitian military responsible for the arbitrary detention and torture of plaintiffs were employees, representatives, or agents of defendant Avril, acting under his instructions, authority, and control and acting within the scope of the authority granted by him. Many of the tormentors included members of the Presidential Guard and Avril's personal security detail.

31. All of the plaintiffs suffered arbitrary detention, torture, and cruel, inhuman or degrading treatment inflicted by soldiers acting under the direction and control of defendant Prosper Avril.

32. The arbitrary detention, torture, and other cruel, inhuman or degrading treatment of plaintiffs Brun, Gilles, and Laforest were conducted under defendant Avril's order, approval, instigation, and knowledge during a round-up of opposition political leaders on January 20th, 1990, the first day of a state of emergency declared by defendant Avril.

### *DAMAGES*

■ As a result of the torture and detention, plaintiffs suffered extensive physical, psychological, and consequential damages. Both compensatory and punitive damages are recoverable for violations of international law. See, e.g., *Filartiga v. Pena–Irala*, 577 F.Supp. 860 (E.D.N.Y.1984). The Court awards compensatory damages for the pain and suffering, medical expenses, and lost in-

come suffered by the plaintiffs in the following amounts:

| | |
|---|---|
| Evans Paul | $2,500,000.00 |
| Jean August Mesyeux | $2,500,000.00 |
| Marino Etienne | $3,500,000.00 |
| Gerald Emile Brun | $2,500,000.00 |
| Serge Gilles | $3,000,000.00 |
| Fernand Gerard Laforest | $3,000,000.00 |

The Court finds that punitive damages are appropriate in this case as the acts committed by the defendant were malicious, wanton, and oppressive. An award of punitive damages must reflect the egregiousness of the defendant's conduct, the central role he played in the abuses, and the international condemnation with which these abuses are viewed. *Filartiga*, 577 F.Supp. at 866.

█ Although in assessing punitive damages, the Court must consider the defendant's financial condition, the burden is on the defendant to introduce evidence of his modest means. *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978). Here, the plaintiffs presented evidence showing that Avril, the former finance minister in the Duvalier government, is a person of considerable wealth. The defendant, who refused to answer interrogatories concerning his financial worth or to appear for deposition, presented no evidence to the contrary. The Court concludes that an award of punitive damages in the amount of *$4,000,000.00* to each plaintiff is appropriate considering the extreme brutality of the defendant's acts, which such damages are designed to punish.

**FINAL JUDGMENT** is hereby entered against the defendant, in favor of the plaintiffs individually for damages as found herein, in the total amount of $41,000.000.00, for which sum execution may issue forthwith.

**DONE AND ORDERED.**