Marlene ALEJANDRE, individually and as personal representative of the Estate of Armando Alejandre, deceased, Plaintiff,

v.

The REPUBLIC OF CUBA; the Cuban Air Force, Defendants.

Mirta MENDEZ, as personal representative of the Estate of Carlos Alberto Costa, deceased, Plaintiff,

v.

The REPUBLIC OF CUBA; the Cuban Air Force, Defendants.

Mario T. DE LA PEÑA and Miriam de la Peña, individually and as personal representatives of the Estate of Mario M. de la Peña, deceased, Plaintiff,

v.

The REPUBLIC OF CUBA; the Cuban Air Force, Defendants.

Nos. 96–10127–CIV, 96–10128–CIV.

United States District Court, S.D. Florida.

Dec. 17, 1997.

---

Roberto Martinez, Greenberg Traurig HoffmanLipoff Rosen & Quentel, Miami, FL, Aaron Samuel Podhurst, Victor Manuel Diaz, Jr., Xavier Martinez, Podhurst Orseck Josefsberg Eaton Meadow Olin & Perwin, Miami, FL, for Plaintiff.

## FINAL JUDGMENT

JAMES LAWRENCE KING, District Judge.

### I. Introduction

The government of Cuba, on February 24, 1996, in outrageous contempt for international law and basic human rights, murdered four human beings in international airspace over the Florida Straits. The victims were Brothers to the Rescue pilots, flying two civilian, unarmed planes on a routine humanitarian mission, searching for rafters in the waters between Cuba and the Florida Keys.

As the civilian planes flew over international waters, a Russian built MiG 29 of the Cuban Air Force, without warning, reason, or provocation, blasted the defenseless planes out of the sky with sophisticated air-to-air missiles in two separate attacks. The pilots and their aircraft disintegrated in the mid-air explosions following the impact of the missiles. The destruction was so complete that the four bodies were never recovered.

■■■ The personal representatives of three of the deceased instituted this action against the Republic of Cuba ("Cuba") and the Cuban Air Force to recover monetary damages for the killings. One of the victims was not a U.S. citizen and his family therefore could not join in the suit. This is the first lawsuit to rely on recent legislative enactments that strip foreign states of immunity for certain acts of terrorism. Neither Cuba nor the Cuban Air Force has defended this suit, asserting through a diplomatic note that this Court has no jurisdiction over Cuba or its political subdivisions. A default was thus entered against both Defendants on April 23, 1997 pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. Because this is a lawsuit against a foreign state, however, the Court may not enter judgment by default. Rather, the claimants must establish their "claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e) (1994); *see Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951 (11th Cir.1996).[1] These three consolidated cases proceeded to trial on November 13, 14, and 20, 1997, on the issues of liability and damages. Because the Court finds that neither Cuba nor the Cuban Air Force is immune from suit for the killings, and because the facts amply prove both Defendants' liability and Plaintiffs' damages, the Court will enter judgment against Defendants.

---

1. The Congressional purpose behind this section was to protect foreign states from "unfounded default judgments rendered solely upon a procedural default." *Compania Interamericana,* 88 F.3d at 950–51. As detailed more fully below, the abundant evidence offered at trial more than satisfies the Court that Plaintiffs are entitled to relief. Moreover, it bears mention that Cuba's default has been willful, as evidenced by its diplomatic note rejecting this Court's jurisdiction, further bolstering the entry of a default judgment. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238 (2d Cir.1994).

## II. Findings of Fact

At trial, Plaintiffs presented extensive testimonial and documentary evidence in support of their claims. Because Cuba has presented no defense, the Court will accept as true Plaintiffs' uncontroverted factual allegations. *See Thomson v. Wooster*, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885); *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1975). The pertinent facts are as follows.

### A. The Victims

Armando Alejandre was forty-five years old at the time of his death. Although born in Cuba, Alejandre made Miami, Florida his home at an early age and became a naturalized U.S. citizen. Alejandre served an active tour of duty for eight months in Vietnam, completed his college education at Florida International University, and worked as a consultant to the Metro–Dade Transit Authority at the time of his death. He is survived by his wife of twenty-one years, Marlene Alejandre, who serves as the Personal Representative of his estate, and his daughter Marlene, a college student. Both are Plaintiffs in this lawsuit.

Carlos Alberto Costa was born in the United States in 1966 and resided in Miami. He was only twenty-nine years old when the Cuban government ended his life. Always interested in aviation and hoping to someday oversee the operations of a major airport, Costa earned his bachelor's degree at Embry–Riddle Aeronautical University and worked as a Training Specialist for the Dade County Aviation Department. He is survived by his parents, Mirta Costa and Osvaldo Costa, and by his sister, Mirta Mendez, all of whom sue on his behalf.

Mario Mañuel De la Peña was also born in the United States and was a mere twenty-four years old at the time of his death. Working toward his goal of being an airline pilot, De la Peña was in his last semester at Embry–Riddle when he was killed. During that semester he had obtained a coveted and highly competitive internship with American Airlines. Embry–Riddle granted De la Peña a bachelor's degree in Professional Aeronautics posthumously. He is survived by a younger brother, Michael De La Peña, and his parents, Mario T. De la Peña and Miriam De la Peña, both of whom are Plaintiffs in this case.

### B. The Shootdown

Alejandre, Costa, and De la Peña were all members of a Miami-based humanitarian organization known as *Hermanos al Rescate*, or Brothers to the Rescue. The organization's principal mission was to search the Florida Straits for rafters, Cuban refugees who had fled the island nation on precarious inner tubes or makeshift rafts, often perishing at sea. Brothers to the Rescue would locate the rafters and provide them with lifesaving assistance by informing the U.S. Coast Guard of their location and condition.

On the morning of February 24, 1996, two of Brothers to the Rescue's civilian Cessna 337 aircraft departed from Opa Locka Airport in South Florida.[2] Costa piloted one plane, accompanied by Pablo Morales, a Cuban national who had once been a rafter himself. De la Peña piloted the second plane, with Alejandre as his passenger. Before departing, the planes notified both Miami and Havana traffic controllers of their flight plans, which were to take them south of the 24th parallel. The 24th parallel, well north of Cuba's twelve-mile territorial sea, is the northernmost boundary of the Havana Flight Information Region. Commercial and civilian aircraft routinely fly in this area, and aviation practice requires that they notify Havana's traffic controllers when crossing south through the 24th parallel. Both Brothers to the Rescue planes complied with this custom by contacting Havana, identifying themselves, and stating their position and altitude.

While the two planes were still north of the 24th parallel, the Cuban Air Force launched two military aircraft, a MiG–29 and a MiG–23, operating under the control of

---

**2.** A third Brothers to the Rescue, Cessna 337 aircraft also departed on the mission. That plane returned safely to the United States.

Cuba's military ground station. The MiGs carried guns, close range missiles, bombs, and rockets and were piloted by members of the Cuban Air Force experienced in combat.

Excerpts from radio communications between the MiG–29 and Havana Military Control detail what transpired next:

| | |
|---|---|
| MiG–29 | OK, the target is in sight; the target is in sight. It's a small aircraft. Copied, small aircraft in sight. |
| MiG–29 | OK, we have it in sight, we have it in sight. |
| MiG–29 | The target is in sight. |
| Military Control | Go ahead. |
| MiG–29 | The target is in sight. |
| Military Control | Aircraft in sight. |
| MiG–29 | Come again? |
| MiG–29 | It's a small aircraft, a small aircraft. |
| MiG–29 | It's white, white. |
| Military Control | Color and registration of the aircraft? |
| Military Control | Buddy. |
| MiG–29 | Listen, the registration also? |
| Military Control | What kind and colour? |
| MiG–29 | It is white and blue. |
| MiG–29 | White and blue, at a low altitude, a small aircraft. |
| MiG–29 | Give me instructions. |
| MiG–29 | Instructions! |
| MiG–29 | Listen, authorize me . . . |
| MiG–29 | If we give it a pass, it will complicate things. We are going to give it a pass. Because some vessels are approaching there, I am going to give it a pass. |
| MiG–29 | Talk, talk. |
| MiG–29 | I have it in lock-on, I have it in lock-on. |
| MiG–29 | We have it in lock-on. Give us authorization. |
| MiG–29 | It is a Cessna 337. That one. Give us authorization, damn it! |
| Military Control | Fire. |
| MiG–29 | Give us authorization, damn it, we have it. |
| Military Control | Authorized to destroy. |
| MiG–29 | I'm going to pass it. |

| | |
|---|---|
| Military Control | Authorized to destroy. |
| MiG–29 | We already copied. We already copied. |
| Military Control | Authorized to destroy. |
| MiG–29 | Understood, already received. Already received. Leave us alone for now. |
| Military Control | Don't lose it. |
| MiG–29 | First launch. |
| MiG–29 | We hit him! Damn! We hit him! We hit him! We retired him! |
| MiG–29 | Wait to see where it fell. |
| MiG–29 | Come on in, come on in! Damn, we hit. F——s! |
| MiG–29 | Mark the place where we took it out. |
| MiG–29 | We are over it. This one won't mess around anymore. |
| Military Control | Congratulations to the two of you. |
| MiG–29 | Mark the spot. |

. . . .

| | |
|---|---|
| MiG–29 | We're climbing and returning home. |
| Military Control | Stand by there circling above. |
| MiG–29 | Over the target? |
| Military Control | Correct. |
| MiG–29 | S—t, we did tell you, Buddy. |
| Military Control | Correct, the target is marked. |
| MiG–29 | Go ahead. |
| Military | OK, climb to 3200, 4000 meters above the destroyed target and maintain economical speed. |
| MiG–29 | Go ahead. |
| Military Control | I need you to stand by . . . there. What heading did the launch have? |
| MiG–29 | I have another aircraft in sight. |
| MiG–29 | We have another aircraft. |
| Military Control | Follow it. Don't lose the other small aircraft. |
| MiG–29 | We have another aircraft in sight. It's in the area where (the first aircraft) fell. It's in the area where it fell. |
| MiG–29 | We have the aircraft in sight. |

| Military Control | Stand by. |
|---|---|
| MiG–29 | Comrade, it's in the area of the event. |
| MiG–29 | Did you copy? |
| MiG–29 | OK, this aircraft is headed 90 degrees now. |
| MiG–29 | It's in the area of the event, where the target fell. They're going to have to authorize us. |
| MiG–29 | Hey, the SAR isn't needed. Nothing remains, nothing. |
| Military Control | Correct, keep following the aircraft. You're going to stay above it. |
| MiG–29 | We're above it. |
| Military Control | Correct ... |
| MiG–29 | For what? |
| MiG–29 | Is the other authorized? |
| Military Control | Correct. |
| MiG–29 | Great. Let's go Alberto. |
| MiG–29 | Understood; we are now going to destroy it. |
| Military Control | Do you still have it in sight? |
| MiG–29 | We have it, we have it, we're working. Let us work. |
| MiG–29 | The other is destroyed; the other is destroyed. Fatherland or death, s—t! The other is down also. |

---

The missiles disintegrated the Brothers to the Rescue planes, killing their occupants instantly and leaving almost no recoverable debris. Only a large oil slick marked the spot where the planes went down. The Cuban Air Force never notified or warned the civilian planes, never attempted other methods of interception, and never gave them the opportunity to land. The MiGs' first and only response was the intentional and malicious destruction of the Brothers to the Rescue planes and their four innocent occupants. Such behavior violated clearly established international norms requiring the exhaustion of all measures before resort to aggression against any aircraft and banning the use of force against civilian aircraft altogether.[3]

## C. The International Reaction

The international community moved quickly and in unison to condemn the murders. The United Nations Security Council, the

3. These norms have been codified in various international instruments. *See, e.g.,* Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295 (both the United States and Cuba are parties to the Convention). The proscription on using force against civilian planes attaches even if they penetrate foreign airspace. *See, e.g.,* Kay Hailbronner, *Freedom of the Air and the Convention on the Law of the Sea,* 77 Am. J. Int'l L. 490, 514 (1983) ("Even if an order to land is deliberately disregarded, a civil unarmed aircraft that intrudes into foreign airspace may not be fired upon."). Common sense dictates that the negligible threat civilian planes may pose does not justify the possible loss of life.

European Union, and the International Civil Aviation Organization ("ICAO") were among the many to issue statements deploring Cuba's excessive use of force. The French Ministry of Foreign Affairs stated that "France regrets the use of such brutal methods which nothing can justify, regardless of the circumstances, toward aircraft presenting no threat to the safety of the population." Statement of the Spokesperson of the French Ministry of Foreign Affairs (Feb. 26, 1996) (Pls.' Ex. 26(b)). Following an extensive investigation, the ICAO issued a report in June 1996 concluding that the planes were shot down over international waters. The ICAO also adopted a resolution reaffirming the prohibition of the use of weapons against civilian aircraft in flight and declaring such practices incompatible with elementary considerations of humanity and the dictates of customary international law.

The shootdown elicited a similar reaction from the United States and even precipitated the enactment of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 22 U.S.C.A. §§ 6021–6091 (West.Supp. 1997), which includes an entire section devoted to a condemnation of the Cuban attack, *see id.* § 6046. Among other findings, Congress characterized the shootdown as wholly disproportionate: "The response chosen by Fidel Castro, the use of lethal force, was completely inappropriate to the situation presented to the Cuban Government, making such actions a blatant and barbaric violation of international law and tantamount to cold-blooded murder." *Id.* § 6046(a)(10). Finally, Congress concluded: "The Congress strongly condemns the act of terrorism by the Castro regime in shooting down the Brothers to the Rescue aircraft on February 24, 1996." *Id.* § 6046(b)(1).

4. The Court notes that it may retroactively apply AEDPA's amendments to the FSIA in this case. As part of AEDPA, the new exception to immunity was enacted on April 24, 1996. Yet the acts in question occurred in February 1996, two months before the FSIA was amended. AEDPA itself, however, addresses when its provisions are to become effective. It provides that the amendments to the FSIA "shall apply to any cause of action arising before, on, or after the date of the

## III. Conclusions of Law

### A. Jurisdiction and Liability

▮ District courts have original jurisdiction to hear suits, not barred by foreign sovereign immunity, that are brought against foreign states. *See* 28 U.S.C. § 1330 (1994). Under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C.A. §§ 1602–1611 (West 1994 & Supp.1997), a federal court lacks subject matter jurisdiction to hear a claim against a foreign state unless the claim falls within one of the FSIA's enumerated exceptions, *id.* § 1605; *see Saudi Arabia v. Nelson,* 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). For example, if a foreign state commits a tortious act or engages in commercial activities in the United States, it may fall into one of the FSIA's exceptions and be stripped of immunity from suit in U.S. courts. 28 U.S.C.A. § 1605(2),(5). Most recently, Congress crafted an additional, narrow exception to foreign sovereign immunity through the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, § 221, 110 Stat. 1214. AEDPA amended the FSIA to allow suits in U.S. courts against a foreign state that engages in acts of terrorism under certain specified circumstances. As a result, the FSIA now provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in any case

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C.A. § 1605(a)(7).[4] In addition, section 1605(a)(7) imposes the following require-

enactment of this Act." Pub.L. 104–132, § 221(c), 110 Stat. 1214. Therefore, the plain language of the statute evidences a clear Congressional intent to have section 1605(a)(7) apply retroactively. In cases such as this one, where "Congress has expressly prescribed the statute's proper reach[,] there is no need to resort to judicial default rules." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 271, 114 S.Ct. 1483, 128 L.Ed.2d 229

ments: (1) the U.S. must have designated the foreign state as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979; (2) the act must have occurred outside the foreign state; and (3) the claimants and victims must have been U.S. nationals at the time the acts occurred.[5] *Id.* § 1605(a)(7)(A)–(B).

■ The record of this trial clearly establishes that all of these requirements have been met. First, the unprovoked firing of deadly rockets at defenseless, unarmed civilian aircraft undoubtedly comes within the statute's meaning of "extrajudicial killing." That term is defined in reference to its use in the Torture Victim Protection Act of 1991 ("TVPA"), which states that "the term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note (1994). Cuba's actions in this case easily come within this definition. The occupants of the two civilian, unarmed planes received no warning whatsoever of their imminent destruction, much less the judicial process contemplated by the TVPA. *See Lafontant v. Aristide,* 844 F.Supp. 128, 138 (E.D.N.Y.1994) (finding that assassination of political opponent fell within statute's definition of extrajudicial killing).

■ Second, the Cuban Air Force was acting as an agent of Cuba when it committed the killings.[6] The evidence adduced at trial demonstrated how the pilots of the Cuban MiGs obtained authorization from state officials prior to the shootdown of each plane and hearty congratulations from those officials after the planes were destroyed.

Third, section 1605(a)(7)'s requirement that the foreign state have been designated

as a state sponsor of terrorism has also been satisfied. Cuba was one of only seven states so designated at the time pursuant to the authority of the Export Administration Act of 1979. *See* 61 Fed.Reg. 12,927 (1996).

■ Fourth, the act occurred outside of Cuban territory. Plaintiffs have presented undisputed and competent evidence that the planes were shot down over international waters. As discussed above, the ICAO Report concluded that the planes were over international waters when they were destroyed. Congress reached the same conclusion, finding that the first plane was "18 miles from the Cuban coast" when it was shot down, and that the second plane was "30.5 miles from the Cuban coast" when it was fired upon. 22 U.S.C.A. § 6046(a)(7)–(8). These numbers place the planes well outside the twelve-mile territorial sea claimed by Cuba and permitted under international law.[7] In addition, evidence from the crew and passengers on a nearby cruise ship, the Majesty of the Seas, and private fishing vessel, the Triliner, established beyond any doubt that the civilian aircraft were flying in international air space *toward Florida* (and away from Cuba) when the Defendants committed this brutal act of terrorism.

Finally, Plaintiffs and three of the four murdered pilots were U.S. citizens at the time of the shootdown. De la Peña and Costa were born in the United States, and Alejandre was a naturalized U.S. citizen. Plaintiffs were also U.S. citizens when the incident took place. Consequently, the facts of this case fall squarely within the requirements of section 1605(a)(7). Indeed, this is precisely the type of action for which Congress meant to provide redress by stripping terrorist states of immunity from the judgment of U.S. courts.

(1994). Thus, Plaintiffs may rely on section 1605(a)(7)'s exception to immunity.

5. It is this last requirement that prevents the family of Pablo Morales, the fourth Brothers to the Rescue member who was killed, to take part in this suit. Pablo Morales was a Cuban national at the time of the incident.

6. The Cuban Air Force is clearly an agent of the Cuban state, as it acts on Cuba's behalf and

subject to Cuba's control. *See Archer v. Trans/American Servs., Ltd.,* 834 F.2d 1570, 1573 (11th Cir.1988); Restatement (Second) of Agency § 1 (1958) (defining agency relationship).

7. The rules governing the territorial sea and its permissible boundaries can be found in the United Nations Convention on the Law of the Sea, Oct. 7, 1982, art. 3, U.N. Doc. A/CONF 62/122 (1981), *reprinted in* 21 I.L.M. 1261 (1982).

Having established an exception to foreign sovereign immunity, Plaintiffs base their substantive cause of action on a different statute, also enacted in 1996, entitled Civil Liability for Acts of State Sponsored Terrorism, Pub.L. 104–208, § 589, 110 Stat. 3009 (codified at 28 U.S.C.A. § 1605 note (West.Supp.1997)) ("Civil Liability Act"). The Civil Liability Act creates a cause of action against agents of a foreign state that act under the conditions specified in FSIA section 1605(a)(7). It thus serves as an enforcement provision for acts described in section 1605(a)(7). If Plaintiffs prove an agent's liability under this Act, the foreign state employing the agent would also incur liability under the theory of respondeat superior. *See Skeen v. Federative Republic of Brazil,* 566 F.Supp. 1414, 1417 (D.D.C.1983) (explaining that section 1605(a)(5) "is essentially a respondeat superior statute, providing an employer (the foreign state) with liability for certain tortious acts of its employees."). Because, as detailed above, Plaintiffs have presented compelling evidence that all of the relevant statutory requirements have been met, the Court finds that both the Cuban Air Force and Cuba are liable for the murders of Alejandre, Costa, and De la Peña. *Cf. Rafidain,* 15 F.3d at 242–43 (finding evidence sufficient to justify default judgment against foreign governmental entities); *De Letelier v. Republic of Chile,* 502 F.Supp. 259, 266 (D.D.C.1980) (finding evidence sufficient to justify default judgment against Republic of Chile for murder of Chilean ambassador).

## B. Damages

The amount of damages that Plaintiffs may recover in this case is specified in the Civil Liability Act. It provides that an agent of a foreign state who commits an extrajudicial killing as described in FSIA section 1605(a)(7) shall be liable for "money damages which may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C.A. § 1605 note. Thus, the Cuban Air Force is liable for both compensatory and punitive damages. Under the theory of respondeat superior, Cuba is liable for the same amount of damages as its agent, with the exception of punitive damages, which the FSIA prohibits against foreign states. 28 U.S.C. § 1606.[8]

### 1. Compensatory Damages

To support their claim for compensatory damages, Plaintiffs presented the testimony of Dr. David Williams, an expert economist. Using widely-accepted methodology, Dr. Williams calculated the present value of De la Peña's and Costa's lost wages and benefits. He also calculated the present value of Alejandre's lost wages, benefits, and services to his family. The Court finds Dr. Williams's calculations to be reasonable and therefore adopts his figures for lost wages, benefits, and services.

In addition, Plaintiffs request damages for pain and suffering. The record is replete with testimony from Plaintiffs and other family members of the deceased, which attests in painful detail to the grief they have suffered as a result of the killings. The Court finds this evidence more than sufficient to justify the awards for pain and suffering that Plaintiffs request. Thus, total compensatory damages for each. Plaintiff shall be awarded as follows:

To the Estate of ARMANDO ALEJANDRE:
 for loss of future income earning potential $1,326,525
 for loss of household services 206,388
Estate of ARMANDO ALEJANDRE:
Marlene Alejandre (Wife)
 for mental pain and suffering 7,500,000

8. Section 1606 of the FSIA, which determines the extent of liability in suits against a foreign state, provides in pertinent part: "[T]he foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state *except for an agency or instrumentality thereof* shall not be liable for punitive damages." 28 U.S.C. § 1606 (emphasis added). Thus, although punitive damages may not be assessed against the Republic of Cuba, they may be assessed against the Cuban Air Force. *See Gibbons v. Republic of Ireland,* 532 F.Supp. 668,, 671 (D.D.C.1982); *Letelier,* 502 F.Supp. at 266–67 (D.D.C.1980).

| | | |
|---|---|---|
| for loss of companionship and protection | | 500,000 |
| Marlene Victoria Alejandre (Daughter) | | |
| for mental pain and suffering | | 7,500,000 |
| for loss of parental companionship and guidance | | 500,000 |
| | Total | $17,532,913 |

| | | |
|---|---|---|
| **To the Estate of CARLOS ALBERTO COSTA:** | | |
| for loss of future income earning potential | | $5,130,704 |
| Estate of CARLOS ALBERTO COSTA: | | |
| Osvaldo Costa (Father) | | |
| for mental pain and suffering | | 5,000,000 |
| for loss of society and companionship | | 500,000 |
| Mirta Costa (Mother) | | |
| for mental pain and suffering | | 5,000,000 |
| for loss of society and companionship | | 500,000 |
| | Total | $16,130,704 |

| | | |
|---|---|---|
| **To the Estate of MARIO M. DE LA PEÑA:** | | |
| for loss of future income earning potential | | $5,264,294 |
| Estate of MARIO M. DE LA PEÑA: | | |
| Mario de la Peña (Father) | | |
| for mental pain and suffering | | 5,000,000 |
| for loss of society and companionship | | 500,000 |
| Miriam de la Peña (Mother) | | |
| for mental pain and suffering | | 5,000,000 |
| for loss of society and companionship | | 500,000 |
| | Total | 16,264,294 |

### 2. Punitive Damages

In addition to compensatory damages, punitive damages are explicitly permitted by the Civil Liability Act.[9] Because this is the first case to proceed to trial under this Act, however, there is no precedent to guide the Court in determining whether punitive damages are appropriate in this particular case, and if so, in what amount. Thus, the Court will look both to the traditional purpose behind awarding punitive damages and to analogous federal court cases addressing the role of punitive damages in cases of egregious international human rights violations.

 The purpose of punitive, or exemplary, damages has traditionally been twofold. First, they may serve as a tool to punish truly reprehensible conduct. *See Paul v. Avril*, 901 F.Supp. 330, 336 (S.D.Fla. 1994) (observing that exemplary damages are appropriate when defendant's actions are "malicious, wanton, and oppressive"); Michael L. Rustad, *How the Common Good Is Served by the Remedy of Punitive Damages*, 64 Tenn. L.Rev. 793, 799 (1997) (noting that punitive damages combat "willful and gross disregard of public safety"). In this way, the aggrieved plaintiff is given a socially acceptable avenue of retaliation, and, perhaps more importantly, the "punitive nature of exemplary awards also affords society a means of retribution for wrongs against the community interest." Judith Camile Glasscock, *Emptying the Deep Pocket in Mass Tort Litigation*, 18 St. Mary's L.J. 977, 982 (1987). Punitive damages are also an appropriate remedy in international law. As the Supreme Court has observed, "[A]n attack from revenge and malignity, from gross

---

**9.** The Court observes again that it may impose judgment and damages retroactively. First, Congress expressed its clear intent in AEDPA to allow suits against terrorist states for acts occurring before AEDPA's effective date. *See infra* note 4. Second, the Civil Liability Act and AEDPA's amendments to the FSIA are jurisdictional provisions, and as the Supreme Court has explained, "We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Landgraf*, 511 U.S. at 274. Finally, compensatory damages were already available against foreign states, and punitive damages were available against foreign governmental entities, long before changes to the FSIA made this suit possible. *See* 28 U.S.C. § 1606 (1994).

abuse of power, and a settled purpose of mischief ... may be punished by all the penalties which the law of nations can properly administer." *The Marianna Flora,* 24 U.S. (11 Wheat.) 1, 41, 6 L.Ed. 405 (1825).

The law also provides for awards of punitive damages upon the sound reasoning that they will deter others from committing similar acts. Courts reason that if a sizeable monetary sum over and above compensatory damages is assessed against the wrongdoer, he and others may be prevented from engaging in similar behavior in the future. As acknowledged in the Restatement (Second) of Torts, punitive damages are meant both "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1977); *see Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (jury is "instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct" in deciding whether to award punitive damages).

Most courts faced with gross violations of international human rights have employed the tool of punitive damages to achieve these dual purposes. By granting large exemplary awards, courts have both expressed their condemnation of human rights abuses and attempted to deter other international actors from engaging in similar practices. Most of these cases have been brought pursuant to the authority of the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, which allows aliens to sue in U.S. federal court for torts that violate "the law of nations or a treaty of the United States," and the more recently enacted TVPA, which establishes a cause of action against individuals for torture.

An early example is the seminal case of *Filartiga v. Pena–Irala,* 577 F.Supp. 860 (E.D.N.Y.1984), which addressed the propriety of punitive damages under the ATCA. In *Filartiga,* two Paraguayan citizens brought suit against a Paraguayan general, alleging that he tortured and murdered Joelito Filartiga in retaliation for his father's political beliefs. *Id.* at 861. The court found that an international norm prohibiting torture was so strong and widespread as to have crystallized into a precept of international law. The court reasoned that the violation of such a norm against torture could only be vindicated by imposing punitive damages. In determining a specific amount, the court considered both the assets of the defendant and the nature of the acts at issue. The court explained:

> Chief among the considerations the court must weigh is the fact that this case concerns not a local tort but a wrong as to which the world has seen fit to speak. Punitive damages are designed not merely to teach a defendant not to repeat his conduct but to deter others from following his example. To accomplish that purpose this court must make clear the depth of the international revulsion against torture and measure the award in accordance with the enormity of the offense. Thereby the judgment may perhaps have some deterrent effect.

*Id.* at 866 (internal citation omitted). These considerations led the court to assess $5 million in punitive damages against the individual general for each plaintiff. Courts facing similar claims under the ATCA have followed *Filartiga*'s lead and awarded sizeable punitive damages.[10] *See* Beth Stephens & Michael Ratner, *International Human Rights Litigation in U.S. Courts* 213–14 (1996). The TVPA, which was enacted to enhance the remedies available under the ATCA, also seems to contemplate punitive damages

**10.** *See, e.g., Xuncax v. Gramajo,* 886 F.Supp. 162, 199 n. 45 (D.Mass.1995) (documenting following cases: *Trajano v. Marcos,* No. 86–0207 (D.Haw. May 19, 1991) ($1.25 million to victim's estate, $1.25 million to victim's mother); *Forti v. Suarez,* No. 87–2058–DLJ (N.D.Cal. Apr. 25, 1990) ($3 million to one plaintiff, $1 million to other); *Quiros de Rapaport, et al. v. Suarez–Mason,* No. C87–2266–JPV (N.D.Cal. Apr. 11, 1989) ($10 million to two victims' widows, $5 million to victims' mother and sister); *Martinez–Baca v. Suarez–Mason,* No. 87–2057–SC (N.D.Cal. Apr. 22, 1988) ($10 million to victim)); *Todd v. Panjaitan,* No. 92–12255–PBS, 1994 WL 827111, at *1 (D.Mass. Oct.26, 1994) ($10 million to only plaintiff); *Paul,* 901 F.Supp. at 336 ($4 million to each of six plaintiffs; *see also Hilao v. Estate of Marcos,* 103 F.3d 767, 780–81 (9th Cir.1996) (upholding $1.2 billion in punitive damages under Philippine law).

awards. *See Xuncax*, 886 F.Supp. at 199–200.

Part of the reason why punitive damages have been extensively awarded in cases brought under the ATCA is that they serve to redress conduct so heinous that it has been condemned by the world community. Punitive damages help reinforce "the consensus of the community of humankind," *Filartiga*, 577 F.Supp. at 863, that horrific abuses against the person will not be tolerated. Although, unlike claimants proceeding under the ATCA, Plaintiffs in this case do not have to prove a violation of international law in order to be entitled to damages, the Court finds that such an inquiry would be helpful in assessing the amount of punitive damages that should be awarded.

Like the torture in *Filartiga*, the practice of summary execution has been consistently condemned by the world community. A multitude of international agreements and declarations proclaim every individual's right not to be deprived of life wantonly and arbitrarily.[11] So widespread is the consensus against extrajudicial killing that "every instrument or agreement that has attempted to define the scope of international human rights has 'recognized a right to life coupled with a right to due process to protect that right.'" *Xuncax*, 886 F.Supp. at 185 (citation omitted). The ban on extrajudicial killing thus rises to the level of *jus cogens*, a norm of international law so fundamental that it is binding on all members of the world community.[12] *See de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1397 (5th Cir.1985) ("[T]he standards of human rights that have been generally accepted-and hence incorporated into the law of nations ... encompass only such basic rights as the right not to be murdered, tortured, or otherwise subjected to cruel, inhuman or degrading punishment ... and the right not to be arbitrarily detained."); *Forti v. Suarez–Mason*, 672 F.Supp. 1531, 1542 (N.D.Cal.1987) ("The proscription of summary execution or murder by the state appears to be universal, is readily definable, and is of course obligatory."); *De Letelier*, 488 F.Supp. at 673 (stating that assassination is "clearly contrary to the precepts of humanity as recognized in both national and international law"); Restatement (Third) of Foreign Relations Law of the United States § 702(c) (1986) ("A state violates [customary] international law if, as a matter of state policy, it practices, encourages, or condones ... the murder or causing the disappearance of individuals.").

Cuba's extrajudicial killings of Mario T. De la Peña, Carlos Alberto Costa, and Armando Alejandre violated clearly established principles of international law. More importantly, they were inhumane acts against innocent civilians. The fact that the killings were premeditated and intentional, outside of Cuban territory, wholly disproportionate, and executed without warning or process makes this act unique in its brazen flouting of international norms. There appears to be no precedent for a military aircraft intentionally shooting down an unarmed, civilian plane.[13]

---

**11.** International instruments proscribing extrajudicial killings, to cite only a few, include the following: Universal Declaration of Human Rights, Dec. 10, 1948, art. 3, G.A. Res. 217A(III), U.N. Doc. A/810; International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 6(1), G.A. Res. 2200, U.N. GAOR, 21st Sess., Supp. No. 16, U.N. Doc. A/6316, 999 U.N.T.S. 171; American Declaration of the Rights and Duties of Man, May 2, 1948, art. I, OEA/ser.L/V/II.23, doc. 21, rev. 6 (1979). Moreover, the international community's commitment to the peaceful resolution of disputes is fundamental to the structure of the United Nations Charter and to other international instruments. U.N. Charter, arts. 1, 2, 33, 39; *see also* Charter of the Organization of American States arts. 24–27, 3, para. I.

**12.** As the Ninth Circuit has explained, "Jus cogens norms, which are nonderogable and peremptory, enjoy the highest status within customary international law, are binding on all nations, and can not be preempted by treaty." *U.S. v. Matta–Ballesteros*, 71 F.3d 754, 764 n. 5 (9th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997).

**13.** The only conceivable parallel may be the shootdown of KAL Flight 007 by the former Soviet Union in 1983. That incident can be distinguished, however, by two keys facts: First, the Soviets were arguably under the impression that the KAL plane was a military aircraft, and, second, the plane had strayed into Soviet airspace. Neither of these facts is true in this case. Despite the fact that the KAL plane was in Soviet airspace, a commentator studying the incident concluded that the lethal use of force was completely inappropriate: "'Exclusive sovereignty'

The Court must therefore fashion a remedy consistent with the unprecedented nature of this act. *See Filartiga,* 577 F.Supp. at 865 ("The nature of the acts is plainly important."). The Court finds that Plaintiffs have proven their clear entitlement to punitive damages. Based upon this record, the Court would be shirking its duty were it to refrain from entering a substantial punitive damage award for the dual purpose of (1) expressing the strongest possible condemnation of the Cuban government for its responsibility for commission of this monstrous act, and (2) deterring Defendants from ever again committing other crimes of terrorism.

In addition to considerations of the heinousness of Cuba's act, the Court will follow the traditional approach of considering the Cuban Air Force's assets in its assessment of punitive damages. *See* Restatement (Second) of Torts § 908(2) (1977) ("In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and *the wealth of the defendant.*") (emphasis added); Rustad, *supra,* at 799–800 (describing punitive damages as historically "individualized, tailor-made for the financial condition of the defendant").[14]

Of course, it would be impossible for the Court to calculate precisely the assets of the Cuban Air Force. The record contains, however, testimony as to the value and number of the MiG fighter jets in the Cuban Air Force. Because this testimony is both uncontroverted and credible, the Court will accept it as true. The record reflects that each

MiG is worth approximately $45 million, and that the Cuban Air Force owns approximately 102 MiGs. The total value of this fleet, which is undoubtedly only a fraction of the Cuban Air Force's total assets, is therefore approximately $4.59 billion. The Court finds that 1% of this total, or $45.9 million, should be assessed against the Cuban Air Force for each of the killings. This figure is dictated by the unparalleled nature of Cuba's actions and comports with similar judgments against individual, non-governmental defendants.[15] *See Haslip,* 499 U.S. at 19 (upholding punitive damages award that was more than four times amount of compensatory damages). Monetary damages, in whatever amount, can never adequately express the revulsion of this Court, and every civilized society, over these callous murders. Perhaps, however, this decision may serve in some small way as a deterrent to others in the future.

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that judgment is hereby entered on behalf of Plaintiffs and against Defendants the Republic of Cuba and the Cuban Air Force for total compensatory damages of $49,927,911. Further, judgment is hereby entered for Plaintiffs and against the Defendant the Cuban Air Force (only) as punitive damages, the sum of One Hundred Thirty Seven Million, Seven Hundred Thousand Dollars ($137,700,000).

The total compensatory and punitive damages herewith awarded to Plaintiffs are $187,627,911, for which sum execution may issue forthwith against the Defendants Cuba

---

over airspace above a state was not enough to justify employing force." Craig A. Morgan, *The Shooting of Korean Air Lines Flight 007: Responses to Unauthorized Aerial Incursions, in International Incidents: The Law that Counts in World Politics,* 202, 210 (W. Michael Reisman & Andrew R. Willard eds., 1988). International consensus is clear:

> [W]hen measures of force are employed to protect territorial sovereignty, whether on land, on sea, or in the air, their employment is subject to the duty to take into consideration the elementary obligations of humanity, and not to use a degree of force in excess of what is commensurate with the reality and gravity of the threat (if any).

*Id.* at 212–13.

**14.** In a recent decision, the Supreme Court has explained how to determine whether an award of punitive damages may be so excessive as to violate Fourteenth Amendment due process. *See BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The Court considered the reprehensibility of the defendant's conduct, the ratio of punitive damages to actual damages, and the civil penalties applicable to similar misconduct. To the extent that these considerations are applicable in this case, the Court is guided by them in determining its award of punitive damages.

**15.** *See supra* note 10.

and the Cuban Air Force and against any of their assets wherever situated.

DONE and ORDERED at the James Lawrence King Federal Justice Building and United States District Courthouse, Miami, Florida, this 17th day of December, 1997.