**Omar Rodriguez SALUDES and Olivia Saludes, Plaintiffs,**

v.

**REPÚBLICA DE CUBA, et al., Defendants.**

No. 03–20833–CIV.

United States District Court, S.D. Florida.

Sept. 2, 2009.

Pedro Julio Martinez–Fraga, Leah B. Storie, Squire, Sanders & Dempsey LLP, Miami, FL, for Plaintiffs.

## ORDER ENTERING FINAL DEFAULT JUDGMENT

ALAN S. GOLD, District Judge.

This CAUSE is before the Court on Plaintiff Olivia Saludes' Motion for Default Judgment [DE 50] against the República of Cuba, arising from the political imprisonment and torture of Plaintiff's son, Omar Rodriguez Saludes. On September 12, 2008, 577 F.Supp.2d 1243 (S.D.Fla. 2008), I entered an Order granting the Motion in part [DE 51] and requested additional factual and legal support for Plaintiff's claim for damages for intentional infliction of emotional distress. Olivia Saludes has since submitted an affidavit dated February 6, 2009 [DE 59], medical records, and photographs [DE 70]. Having now received the requested materials and further held oral argument on the issue of damages on July 17, 2009, I enter final default judgment in the amount of $2.5 million in compensatory damages and $25 million in punitive damages in favor of Olivia Saludes.

## I. Background

Plaintiff Olivia Saludes and her son Omar Rodriguez Saludes filed this action against the República de Cuba, Fidel Castro Ruz, Raul Castro Ruz, Abelardo Colome Ibarra, Roberto T. Diaz Sotolongo, Felipe Ramon Perez Roque, and the Partido Comunista de Cuba in connection with the arrest and detention of Plaintiff Omar Rodriguez Saludes by the Cuban government. Plaintiffs bring the following claims against Defendants: (1) torture, arbitrary arrest, cruel and inhumane treatment restriction on assembly, denial of the right to a fair trial, and crimes against humanity, based on the Alien Tort Claims Act and the Torture Victim Protection Act, 28 U.S.C. § 1350; (2) torture, based on the Torture Victim Protection Act, 28 U.S.C. § 1350; (3) battery; (4) assault; and (5) intentional infliction of emotional distress. Defendants never responded to Plaintiffs' Complaint, and they have since been held in default. On October 19, 2007, Olivia Saludes moved for default judgment only as to her claim for intentional infliction of emotional distress and only against Defendants the República de Cuba and the Partido Comunista de Cuba ("PCC").

The Motion was granted in part on September 12, 2008. In that Order, I concluded that Defendants were not immune from suit under the applicable exceptions to the Foreign Sovereign Immunities Act ("FSIA"). I further found sufficient evidence, based on the Complaint and the supporting affidavits of Olivia Saludes and Miguel Saludes Garcia, Omar's uncle (respectively, "Saludes Aff." and "Garcia Aff."), to establish that Olivia Saludes had stated a claim for intentional infliction of emotional distress. However, I ordered Olivia Saludes to submit additional affidavits or other evidence to prove the amount of damages to be awarded to Plaintiffs.

■ Before I discuss the award of damages, I first summarize the underlying facts of this case, which are deemed uncontroverted by virtue of the entry of default against Defendants.[1] Omar Rodriquez Saludes ("Mr. Saludes") is a Cuban resident and worked for the Nueva Prensa Agency, one of approximately twenty-one small government independent agencies in Cuba. Saludes Aff. [DE 50–2] at ¶ 4. He has written a number of articles, including many accounts of political prisoners and dissidents in Cuba. *Id.*; Garcia Aff. [DE 50–3], at ¶ 3. Mr. Saludes has previously been detained by Cuban police because of his journalistic activities. Saludes Aff. at ¶ 4.

On approximately April 2, 2003, Mr. Saludes was arrested at his home and taken into custody by Cuban police. Saludes Aff. at ¶ 5. No explanation was given for this arrest, and Mr. Saludes was not shown specific charges or documentation. *Id.* According to the Miguel Saludes Garcia, Mr. Saludes was arrested because of his journalistic activities. Garcia Aff. at ¶ 3. Mr. Saludes was subjected to interrogations that included psychological threats and intimidation after he was arrested. *Id.* at ¶ 4. Amid rumors that he would be executed, he was placed in a cell that was completed enclosed, with no sunlight, and then taken to a trial. *Id.* Mr. Saludes fainted during the trial due to low blood sugar levels. *Id.* Although Mr. Saludes' family hired an attorney to represent him, the attorney was denied access to Mr. Saludes until the day of trial, when he was able to speak with his client in the courtroom. *Id.* at ¶ 5.

Mr. Saludes was sentenced to 27 years in prison. *Id.* He has now served over

---

1. A defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact. *Tyco Fire & Sec. LLC v. Alcocer,* 218 Fed. Appx. 860, 862–63 (11th Cir.2007) (internal citations omitted).

three years in prison, and he has been adopted by Amnesty International as a prisoner of conscience. *Id.* at ¶¶ 6–7. During his imprisonment, he has been beaten, starved, given poor food, placed in solitary confinement, and deprived of medical treatment. Saludes Aff. at ¶ 7.[2] During his time in prison, Mr. Saludes was technically allowed one phone call every fifteen days. Garcia Aff. at ¶ 11. However, Mr. Saludes was sometimes told the phone was broken, and when he was able to make phone calls, he was always accompanied by a guard. *Id.* In addition, Mr. Saludes' telephone call was intercepted and listened to on at least one occasion. *Id.* At oral argument, counsel represented that Mr. Saludes is now only able to make calls once every ninety days, and that he is told the phone is broken every time he asks to use the phone.

Mr. Saludes has been fed three meals a day while in prison, but these meals have generally been inadequate. *Id.* at ¶ 12. On multiple occasions, Mr. Saludes has complained that the food had dirt and worms in it, and one time, his food had animal skin and hair in it. *Id.* Further, Mr. Saludes and the other prisoners have to collect water, available only during a short period of time each day, and keep it in plastic containers for both bathing and drinking. *Id.* at ¶ 13. He has been sleep-

deprived in prison due to the conditions, including insects, rats, and lack of electricity. Garcia Aff. at ¶ 17; Saludes Aff. at ¶ 7.

Mr. Saludes has had a number of medical issues while in prison. He had a medical examination at the end of 2005 and was diagnosed with a liver problem. *Id.* at ¶ 14. Although Mr. Saludes' liver condition requires special medical treatment, he has had no subsequent medical checkups or changes to his diet, he has not had access to proper medication, · and he has received delayed medical attention or been denied medical attention altogether. *Id.*; Saludes Aff. at ¶ 7. Mr. Saludes also suffers from pains and swollen knees. *Id.* at ¶ 16. In addition, Mr. Saludes had intense toothaches while in Aguica, and officials failed to give him proper care or take him to a dentist within a reasonable time. Garcia Aff. at ¶ 16. While at Kilo 8, Mr. Saludes started suffering from a kidney infection and had a fever and sharp pains for several days without treatment. *Id.* He was treated for this condition only after moving to Nieves Morejon. *Id.* Kilo 8 did not have even basic medication for its prisoners. *Id.* Mr. Saludes' has not been able to maintain good personal hygiene because of the lack of water, decent soap, and toothpaste. *Id.* at ¶ 18. Counsel for Olivia Saludes confirmed at oral argument that Mr. Saludes' medical condition continues to worsen.

2. Over the course of his imprisonment, Mr. Saludes has been moved to various facilities in Cuba. He was first moved to a prison in Camaguey, Cuba called "Kilo 8," where he was kept for approximately eight months. Garcia Aff. at ¶ 8. While at Kilo 8, Mr. Saludes was in solitary confinement, and he could only leave his cell once a day for one hour and could not either talk to or see other prisoners. *Id.* Subsequently, Mr. Saludes was transferred to Nieves Morejon in the Sancti Spiritus province of Cuba, where he was in solitary confinement for a few weeks before being placed in a cell that he shared with other prisoners. *Id.* at ¶ 9. At Nieves More-

jon, Mr. Saludes' cell was badly illuminated, there was insufficient drinking water, and the mattresses were stuffed with vegetables, cloths, and materials used to produce female sanitary pads. *Id.* Mr. Saludes was then transferred to a prison in Aguica, Colon in Cuba, where he was placed in an already overpopulated cell with sixteen other prisoners. *Id.* at ¶ 10. This cell was only illuminated by a light bulb in the hallway. *Id.* As of October 2007, Mr. Saludes had been transferred to a maximum security prison in Toledo prison in Havana, Cuba. Saludes Aff. at ¶ 7.

Mr. Saludes' family has tried to provide him with personal hygiene products, medicine, and food, such as powdered milk, cookies, and sausages. *Id.* at ¶ 19. However, the family has been allowed limited visits to Mr. Saludes, ranging from once every 45 days to once every three months. *Id.* Visits are limited to one and a half or two hours, and the number of visitors allowed to see Mr. Saludes has also been limited. *Id.* At first, only his sister, wife, and daughter were allowed to visit him, but his brother-in-law and his uncle Miguel Saludes Garcia have been allowed to see him since his transfer to Nieves Morejon. *Id.* Family visits have also been limited because Mr. Saludes has been held in prisons which are several hundred miles from his family's home. Saludes Aff. at ¶ 8. Mr. Saludes remains in prison to this day.

Mr. Saludes' mother, Plaintiff Olivia Saludes, was living in Kentucky when Mr. Saludes was arrested. *Id.* at ¶ 24. Olivia Saludes attempted to obtain a visa from the Cuban government to visit her son, but the Cuban government denied her visa application in 2003 and 2005. *Id.* at ¶ 25. Mr. Saludes has not been allowed to call his mother or receive any phone call from her. *Id.* Olivia Saludes has been forced to obtain information about her son from third parties, because the Cuban government has not provided her with even the most rudimentary information about him. Saludes Aff. at ¶ 12.

## II. Standard of Review

■■■ In order to recover damages, a plaintiff who prevails on default under the Foreign Sovereign Immunities Act "must prove damages in the same manner and to the same extent as any other default winner." *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 272 (D.D.C.2003). A plaintiff must therefore prove the amount of damages by a reasonable estimate, and a plaintiff must prove future damages to a reasonable certainty or by a preponderance of the evidence. *Id.* In addition, the Court "should consider any special problems of proof arising from the defendant's absence." *Id.*

## III. Discussion

■■■ As discussed above, in granting in part Plaintiff's Motion for Default Judgment, I concluded Olivia Saludes had stated a claim for intentional infliction of emotional distress, stemming from the prolonged imprisonment and torture of her son in Cuba.[3] A claim for intentional infliction of emotional distress is authorized under the Foreign Sovereign Immunities Act. *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107 113 (D.D.C. 2000). Under Florida law, the cause of action requires a plaintiff to prove: "(1) the wrongdoer's conduct was deliberate or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278 (Fla.1985); *Liberty Mut. Ins. Co. v. Steadman,* 968 So.2d 592, 594 (Fla.Dist.Ct.App.2007).[4]

**3.** *See Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27, 32 (D.D.C.2001) (deprivation of adequate food, light, toilet facilities, and medical care for 564 days amounts to torture within the meaning of section 1605(a)(7)). The severity of the conditions of Mr. Saludes' confinement exceeds those confronted by the *Jenco* court.

**4.** Some courts have analyzed tort claims against foreign states by looking to the standards of federal common law, see *Bettis v. Islamic Republic of Iran,* 315 F.3d 325, 332

## A. Compensatory Damages

According to affidavits submitted in support of the Motion for Default Judgment, as a result of Mr. Saludes' detention and of Olivia Saludes' inability to see or talk to her son, Olivia Saludes has been suffering from insomnia and constant nightmares. Garcia Aff. at ¶ 26. As a result of her emotional distress, she has developed diabetes and significant deterioration of her feet, *id.*, and she has also developed a pulmonary condition. Saludes Aff. at ¶ 14. Because of these health problems, Plaintiff Olivia Saludes was compelled to resign from her job and has been unable to work since her resignation. *Id.* She subsequently lost her Medicare benefits and has been forced to live on assistance from her family. *Id.* In response to my Order instructing her to submit affidavits or other evidence to prove the amount of her damages, she has filed a supplemental affidavit again reiterating that Defendants' steadfast refusal to permit her to travel to Cuba to see her son in prison, who she has not seen in six years, and that the medical conditions that have been caused by her emotional trauma has led to her hospitalization. [DE 59, ¶¶ 3, 4]. I find there to be sufficient evidence in the record to justify an award for pain and suffering.

As a result of the imprisonment of her son and the deplorable and degrading conditions of his confinement, Olivia Saludes will continue to suffer mental pain and anguish. In determining the appropriate compensatory damages for Ms. Saludes' pain and suffering, I am guided by prior decisions awarding damages for pain and suffering and for solatium. *Surette v. Is-*

*lamic Republic of Iran*, 231 F.Supp.2d 260, 267 n. 5 (D.D.C.2002) (Friedman, J.) ("In the context of FSIA cases, this Court has recognized the claim of solatium as ... indistinguishable from the claim of intentional infliction of emotional distress."). In the only relevant case against Cuba, a court in this District awarded compensatory damages in the amount of $5 million mental pain and suffering and $500,000 for loss of society and companionship for each parent of the victims of the destruction by the Cuban Air Force of two civilian Cessna planes that were flying over the Florida straits in search of Cuban refugees. *Alejandre v. Republic of Cuba*, 996 F.Supp. 1239, 1249 (S.D.Fla.1997) (King, J.). Likewise, damages in the amount of $5 million was awarded to the parent for the death of their child in two cases against the Islamic Republic of Iran. *Rimkus v. Islamic Republic of Iran*, 575 F.Supp.2d 181, 198 (D.D.C.2008) (death of son in a terrorist bombing in Saudi Arabia, where psychologist testified that the son's death totally altered father's life and resulted in a decline in his physical health); *Beer v. Islamic Republic of Iran*, 574 F.Supp.2d 1 (D.D.C.2008) (death of son in terrorist bombing in Israel).

In reviewing the case law in this area, courts have determined the appropriate amount of damages to be awarded to the victim's family members by looking to the closeness of the familial relationship and the nature of the loss suffered by the claimant. Parents of victims typically receive awards similar in amount to those awarded to children of the victim. *See*

(D.C.Cir.2003), intervening changes in law have ruled many cases' reliance on federal common law improper. *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 71 (D.D.C. 2006) (Lamberth, J.). In any event, court that have applied federal common law look to section 46 of the Restatement Second of Torts, which was expressly adopted as the

basis for the tort of intentional infliction of emotional distress in Florida. *Metropolitan Life Ins. Co.*, 467 So.2d at 279 (expressly recognized the independent tort of intentional infliction of emotional distress and adopting the tort as set forth in section 46, Restatement 2d of Torts (1965)).

*generally Heiser v. Islamic Republic of Iran,* 466 F.Supp.2d 229, 271–356 (D.D.C. 2006). This award for parents and children is typically smaller than the award for pain and suffering damages provided to spouses, but is larger than awards of pain and suffering damages to siblings. See *id.; Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 109–12 (D.D.C.2000) (awarding each of the victim's siblings $5 million where victim, although only a sibling, in fact fulfilled the role of father for his brothers, resulting in an extraordinarily close relationship). The mother and son bond in this case is evidently a close and strong one. However, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Blais v. Islamic Republic of Iran,* 459 F.Supp.2d 40, 60 (D.D.C.2006) (quoting *Haim,* 425 F.Supp.2d at 75); *Kirschenbaum v. Islamic Republic of Iran,* 572 F.Supp.2d 200, 213 (D.D.C.2008) (awarding $2.5 million for each parent for severe injuries suffered by son in a terrorist bombing in Israel). In contrast to the above precedents, Mr. Saludes continues to survive, albeit in prolonged and unconscionable imprisonment of her son as a political prisoner.

■ Applying this legal framework to the facts of this case, after consideration of the full case file, I conclude that Olivia Saludes shall be awarded compensatory damages in the amount of $2.5 million. Although I have located no published cases that addresses the mental anguish of a family member where the victim is imprisoned in conditions that constitute torture, I conclude that the prolonged and profound suffering of Omar Rodriguez Saludes is sufficient to cause mental pain and suffering of Olivia Saludes on par with that suffered by parents whose child was severely and traumatically injured but not held in captivity. I base this conclusion in large part on the fact that Omar Rodriguez Saludes was arrested, imprisoned, and tortured without cause or provocation, and that Olivia Saludes has been systematically barred from having any direct contact with her son or providing any form of assistance to ease his suffering. Further, although not noted in her affidavit, in light of Ms. Saludes' failing health, she is unlikely to live long enough to see her son again, assuming Mr. Saludes serves his full sentence.

## B. Punitive Damages

■ In addition to seeking compensatory damages against the Defendants, Olivia Saludes also seeks punitive damages against the PCC in the amount of $10 million. By the terms of the FSIA, punitive damages are not available against foreign states. 28 U.S.C. § 1606 ("a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages"); *Heiser,* 466 F.Supp.2d at 270; *Blais,* 459 F.Supp.2d at 60.[5] Additionally, punitive damages are not available

5. The recently enacted National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub.L. No. 110–181, 122 Stat. 3, § 1083, revised the terrorism exception to sovereign immunity by repealing § 1605(a)(7) of Title 28 and replacing it with a separate section, § 1605A. Under that provision, punitive damages are now available against a foreign state that is or was a state sponsor of terrorism. Plaintiff does not, however, assert a cause of action under § 1605A. *Kirschenbaum,* 572 F.Supp.2d at 214 (To benefit from § 1605A, plaintiff must have either refiled this action or filed a motion for treatment under § 1605A pursuant to section 1083(c)(2), or filed a new related action pursuant to section 1083(c)(3), within the relevant 60–day period). As such, this Court maintains jurisdiction under § 1605(a)(7), *see Simon v. Republic of Iraq,* 529 F.3d 1187, 1192 (D.C.Cir.2008) (vacated as to pending claims against Iraq, but not to other countries), which does not permit this Court to award punitive damages against foreign states or divisions thereof.

"against divisions of a foreign state that are considered to be the state itself, instead of an agent or instrumentality thereof." *Heiser*, 466 F.Supp.2d at 270 (citations omitted).

■ The threshold question, then, is whether the PCC is a foreign state or subdivision thereof, or an agency or instrumentality of Cuba. I previously concluded in my Order Granting Motion for Default Judgment that the PCC meets the definition of an agency of instrumentality of a foreign state as set forth in the FSIA. 28 U.S.C. § 1603(a).[6] *See Alejandre*, 996 F.Supp. at 1248 (holding that the Cuban Air Force was an agent because it "act[ed] on Cuba's behalf and [was] subject to Cuba's control" and therefore liable for punitive damages) (relying on Restatement (Second) of Agency § 1 (1958)).[7] Turning to the amount of punitive damages to be awarded, courts consider four factors in assessing punitive damages: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants. *Acosta v. Islamic Republic of Iran*, 574 F.Supp.2d 15, 30 (D.D.C.2008); *Paul v. Avril*, 901 F.Supp. 330, 336 (S.D.Fla.1994) (observing that exemplary damages are appropriate when defendant's actions are "malicious, wanton, and oppressive"). A review of case precedents demonstrates that the amount of punitive damages imposed pursuant to FSIA can be wide-ranging. *Compare Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 301 (D.D.C.2003) (imposing $300 million for terrorist bombing in Israel that killed one United States citizen) *with Alejandre*, 996 F.Supp. at 1253 ($45.9 million for each death arising from shooting of civilian airplanes). While I recognize that the act of bombing and shooting are in some respects more severe than arbitrary imprisonment, I have no doubt that the acts of the Cuban government are intended to oppress those in Cuba who seek to freely voice their opinions and ensure the suffering of their families, and that a punitive damage award of sufficient magnitude is needed to serve as a deterrent against similar acts in the future. Accordingly, it is hereby

ORDERED and ADJUDGED that

1. Compensatory damages in the amount of $2.5 million are awarded in favor of Plaintiff Olivia Saludes against Defendants República de Cuba and Partido Comunista de Cuba.

---

**6.** Section 1603(a) defines an agency or instrumentality of a foreign state to be any entity:

(1) which is a separate legal person, corporate or otherwise, and
(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

**7.** The D.C. Circuit has established a categorical approach for determining if an entity should be considered the foreign state itself for the purposes of the FSIA: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C.Cir. 2003). I decline to adopt this approach at this juncture, and note that this approach has been criticized. *Holland v. Islamic Republic of Iran*, 496 F.Supp.2d 1, 32 (D.D.C.2005) (through its narrow reading of "agency or instrumentality," the *Roeder* court has essentially deprived FSIA plaintiffs the kind of deterrent, punitive damages envisioned by Congress when it enacted Section 1605(a)(7), the Flatow Amendment, and Section 1606).

2. Punitive damages in the amount of $25 million are awarded against Defendant Partido Comunista de Cuba.