**Omar Rodriguez SALUDES and Olivia Saludes, Plaintiffs,**

v.

**REPUBLICA DE CUBA, et al., Defendants.**

**No. 03–20833–CIV.**

United States District Court, S.D. Florida.

Sept. 12, 2008.

Pedro Julio Martinez–Fraga, Daniel Eric Vielleville, Squire, Sanders & Dempsey LLP, Miami, FL, for Plaintiffs.

## ORDER GRANTING IN PART MOTION FOR DEFAULT JUDGMENT

ALAN S. GOLD, District Judge.

THIS CAUSE comes before the Court on the Motion for Default Judgment [DE 50] filed by Plaintiff Olivia Saludes on October 19, 2007. Plaintiff Olivia Saludes and her son Omar Rodriguez Saludes filed this action against the Republica de Cuba, Fidel Castro Ruz, Raul Castro Ruz, Abelardo Colome Ibarra, Roberto T. Diaz Sotolongo, Felipe Ramon Perez Roque, and the Partido Comunista de Cuba in connec-

tion with the arrest and detention of Plaintiff Omar Rodriguez Saludes by the Cuban government. Plaintiffs bring the following claims against Defendants: (1) torture, arbitrary arrest, cruel and inhumane treatment restriction on assembly, denial of the right to a fair trial, and crimes against humanity, based on the Alien Tort Claims Act and the Torture Victim Protection Act, 28 U.S.C. § 1350,; (2) torture, based on the Torture Victim Protection Act, 28, U.S.C. § 1350; (3) battery; (4) assault; and (5) intentional infliction of emotional distress. Defendants never responded to Plaintiffs' Complaint, and default was entered against them by the Clerk. In the Motion for Default Judgment, Plaintiff Olivia Saludes moves for default judgment only as to her claim for intentional infliction of emotional distress and only against Defendants the Republica de Cuba and the Partido Comunista de Cuba. Having considered the Motion and affidavits, the applicable case law, and the entire case file, I grant the Motion for Default Judgment in part, order Plaintiff to submit affidavits or other evidence to prove her damages, and I reserve to determine the amount of damages to be awarded.

I. *Standard and Procedure*

■ Before a court may enter a default judgment against a foreign state, the "claimants must establish their claim or right to relief by evidence that is satisfactory to the Court." *Alejandre v. Republic of Cuba,* 996 F.Supp. 1239, 1242 (S.D.Fla. 1997) (internal quotations omitted) (citing 28 U.S.C. 1608(e)(1994); *Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951 (11th Cir.1996)). This standard is identical to the standard for the entry of default judgment against the United States under Federal Rule of Civil Procedure 55(e), which provides that default judgment "shall not be entered against the United States or an officer or agency

thereof unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." *Wachsman v. Islamic Republic of Iran,* 537 F.Supp.2d 85, 91 (D.D.C.2008); Fed.R.Civ.P. 55(e).

■ In evaluating whether a plaintiff has established a claim or right to relief against a foreign state, "the court may accept as true the plaintiffs' uncontroverted evidence, including proof by affidavit." *Wachsman,* 537 F.Supp.2d at 91 (internal quotations and citations omitted) (citing *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 100 (D.D.C.2000); *Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13, 19 (D.D.C.2002)); *see also Oveissi v. Islamic Republic of Iran,* 498 F.Supp.2d 268, 272 (D.D.C.2007) (stating that in determining whether to enter default judgment against a foreign state, "in assessing a plaintiff's claims, a court may accept his uncontroverted evidence as true and may rely on sworn affidavits.") The Court is not required to hold an evidentiary hearing before entering a default judgment against a foreign state. *Ben–Rafael v. Islamic Republic of Iran,* 540 F.Supp.2d 39, 43 (D.D.C.2008) (citing *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 78 (D.D.C.2006)).

■ In cases brought against a foreign government or citizens, the claim must establish that "(1) there has been a waiver of sovereign immunity and (2) the source of substantive law upon which the claimant relies provides an avenue for relief." *Reed v. Islamic Republic of Iran,* 439 F.Supp.2d 53, 59 (D.D.C.2006) (internal quotations omitted) (citing *FDIC v. Meyer,* 510 U.S. 471, 484, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)).

■ With the Motion for Default, Plaintiff Olivia Saludes submitted two affidavits in support of her claim for intentional inflection of emotional distress. Because

Cuba has presented no defense, I accept as true Plaintiff's uncontroverted factual evidence. *See Alejandre,* 996 F.Supp. at 1243.

## II. *Background and Findings of Fact*

Based on the Affidavits submitted by Plaintiff Olivia Saludes and Miguel Saludes Garcia. I find that Plaintiff has established the following facts by satisfactory evidence: Plaintiff Olivia Saludes is the mother of Plaintiff Omar Rodriguez Saludes, and although she was born in Cuba, she came to the United States by airplane on June 28, 2000 as a political refugee. Aff., Olivia Saludes [DE 50–2] at ¶ 3. According to her affidavit, she has owed permanent allegiance to the United States since 2000, and she applied for United States citizenship in June of 2007. *Id.* at 15, Ex. A. Affiant Miguel Saludes Garcia lived in Cuba until August 2005, and he is Plaintiff Olivia Saludes' brother and Plaintiff Omar Rodriguez Saludes' uncle. Aff. Miguel Saludes Garcia [DE 50–3] at ¶¶ 2, 3, 24. While Miguel Saludes Garcia was living in Cuba, he visited Plaintiff Omar Rodriguez Saludes in prison on multiple occasions. *Id.* at ¶ 19.

Plaintiff Omar Rodriquez Saludes ("Mr.Saludes") is a Cuban resident, and he reported for the Nueva Prensa Agency, which is one of approximately twenty-one small government independent agencies in Cuba. Aff., Olivia Saludes [DE 50–2] at ¶ 4. He has written a number of articles, *id.,* and he mostly wrote accounts of political prisoners and dissidents in Cuba. Affidavit of Miguel Saludes Garcia [DE 50–3], at ¶ 3. Mr. Saludes has previously been detained by Cuban police because of his journalistic activities. Aff., Olivia Saludes [DE 50–2] at ¶ 4.

On approximately April 2, 2003, Mr. Saludes was arrested at his home and taken into custody by Cuban police. Aff., Olivia Saludes [DE 50–2], at ¶ 5. No explanation was given for this arrest, and Mr. Saludes was not shown specific charges or documentation. *Id.* According to the Affidavit submitted by Miguel Saludes Garcia, Mr. Saludes was arrested because of his journalistic activities. Aff., Miguel Saludes Garcia [DE 50–3], at ¶ 3.

According to Mr. Garcia's Affidavit, Mr. Saludes was subjected to interrogations that included psychological threats and intimidation after he was arrested. *Id.* at ¶ 4. Amid rumors that he would be executed, he was placed in a cell that was completely enclosed, with no sunlight, and then taken to a trial. *Id.* Mr. Saludes fainted during the trial due to low blood sugar levels. *Id.* Although Mr. Saludes' family hired an attorney to represent him, the attorney was denied access to Mr. Saludes until the day of trial, when he was able to speak with his client in the courtroom. *Id.* at ¶ 5.

Mr. Saludes was sentenced to 27 years in prison. *Id.* He has now served over three years in prison, and he has been adopted by Amnesty International as a prisoner of conscience. *Id.* at ¶¶ 6–7. During his imprisonment, he has been beaten, starved, given poor food, placed in solitary confinement, and deprived of medical treatment. Aff., Olivia Saludes [DE 50–2] at ¶ 7.

After Mr. Saludes was sentenced, he was moved to a prison in Camaguey, Cuba called Kilo 8, where he was kept for approximately eight months. Aff., Miguel Saludes Garcia [DE 50–3] at ¶ 8. While at Kilo 8, Mr. Saludes was in solitary confinement, and he could only leave his cell once a day for one hour and could not either talk to or see other prisoners. *Id.*

Subsequently, Mr. Saludes was transferred to Nieves Morejon in the Sancti Spiritus province of Cuba, where he was in solitary confinement for a few weeks and then placed in a cell that he shared with

other prisoners. *Id.* at ¶ 9. At Nieves Morejon, Mr. Saludes' cell was badly illuminated, there was insufficient drinking water, and the mattresses were stuffed with vegetables, cloths, and the material used to produce female sanitary pads. *Id.*

Mr. Saludes was then transferred to a prison in Aguica, Colon in Cuba, where he was placed in an already overpopulated cell with sixteen other prisoners. *Id.* at ¶ 10. This cell was only illuminated by a light bulb in the hallway. *Id.* As of October 2007, Mr. Saludes had been transferred to a maximum security prison in Toledo prison in Havana, Cuba. Aff, Olivia Saludes [DE 50–2] at ¶ 7.

During his time in prison, Mr. Saludes was technically allowed one phone call every fifteen days. Aff., Miguel Saludes Garcia [DE 50–3] at ¶ 11. However, Mr. Saludes was sometimes told the phone was broken, and when he was able to make phone calls, he was always accompanied by a guard. *Id.* In addition, Mr. Saludes' telephone call was intercepted and listened to on at least one occasion. *Id.*

Mr. Saludes has been fed three meals a day while in prison, but these meals have consisted mainly of carbohydrates and are poorly prepared. *Id.* at ¶ 12. On multiple occasions, Mr. Saludes has complained that the food had dirt and worms in it, and one time, his food had animal skin and hair in it. *Id.* Mr. Saludes and the other prisoners have to collect water, available only during a short period of time each day, and keep it in plastic containers for both bathing and drinking. *Id.* at ¶ 13.

Mr. Saludes has had a number of medical issues while in prison. He had a medical examination at the end of 2005 and was diagnosed with a liver problem. *Id.* at ¶ 14. Although Mr. Saludes' liver condition requires special medical treatment, he has had no subsequent medical checkups or changes to his diet, he has not had access to proper medication, and he has

received delayed medical attention or been denied medical attention altogether. *Id.;* Aff., Olivia Saludes [DE 50–2] at ¶ 7. Mr. Saludes also suffers from pains and swollen knees, but he had not been seen by a doctor until October 2007. *Id.* at ¶ 16. He has been sleep-deprived in prison due to the conditions, including insects, rats, and lack of electricity. Aff., Miguel Saludes Garcia [DE 50–3] at ¶ 17; Aff., Olivia Saludes [DE 50–2] at ¶ 7.

In addition, Mr. Saludes had intense toothaches while in Aguica, and officials failed to give him proper care or take him to a dentist within a reasonable time. Aff., Miguel Saludes Garcia [DE 50–3] at ¶ 16. While at Kilo 8, Mr. Saludes started suffering from a kidney inflection and had a fever and sharp pains for several days without treatment. *Id.* He was treated for this condition only after moving to Nieves Morejon. *Id.* Kilo 8 did not have even basic medication like aspirin for its prisoners. *Id.* Mr. Saludes' has not been able to maintain good personal hygiene because of the lack of water, decent soap, and toothpaste. *Id.* a ¶ 18.

Mr. Saludes' family has tried to provide him with personal hygiene products, medicine, and food, such as powdered milk, cookies, and sausages. *Id.* at ¶ 19. However, the family has been allowed limited visits to Mr. Saludes, ranging from once every 45 days to once every three months. *Id.* Visits are limited to one and a half or two hours, and the number of visitors allowed to see Mr. Saludes has also been limited. *Id.* At first, only his sister, wife, and daughter were allowed to visit him, but his brother-in-law and his uncle Miguel Saludes Garcia have been allowed to see him since his transfer to Nieves Morejon. *Id.* Family visits have also been limited because Mr. Saludes has been held in prisons which are several hundred miles from his family's home. Aff., Olivia Saludes [DE 50–2] at 118.

The prisons offer indoctrinations classes, which Mr. Saludes has refused to attend. Aff., Miguel Saludes Garcia [DE 50–3] at ¶ 20. The guards review books and other written materials taken to Saludes by his family, and some of those materials have not been permitted in the prison, such as the Catholic magazine Vitral and a book by Elpidio de Felix Varela. *Id.* at ¶ 21. The guards also read all letters sent or received by Mr. Saludes. *Id.*

Mr. Saludes' mother, Plaintiff Olivia Saludes, was living in Kentucky when Mr. Saludes was arrested. *Id.* at ¶ 24. Olivia Saludes attempted to obtain a visa from the Cuban government to visit her son, but the Cuban government denied her visa application in 2003 and 2005. *Id.* at ¶ 25. Mr. Saludes has not been allowed to call his mother, Plaintiff Olivia Saludes, or receive any phone call from her. *Id.* Olivia Saludes has been forced to obtain information about her son from third parties, because the Cuban government has not provided her with even the most rudimentary information about him. Aff., Olivia Saludes [DE 50–2] at ¶ 12.

As a result of Mr. Saludes' detention and of Olivia Saludes' inability to see or talk to her son, Olivia Saludes has been suffering from insomnia and has constant nightmares. Aff., Miguel Saludes Garcia [DE 50–3] at ¶ 26. She has developed diabetes, and her feet have shown signs of deterioration, *id.*, and she has also developed a pulmonary condition. Aff., Olivia Saludes [DE 50–2] at ¶ 14. She was compelled to resign her job and has been unable to work since that time, and she has also lost her Medicare benefits. *Id.* She has been compelled to live based on assistance by her family. *Id.*

### III. *Discussion*

■ According to the Eleventh Circuit, the Foreign Sovereign Immunities Act (FSIA) is "the exclusive source of subject matter jurisdiction over all civil actions against foreign states." *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1282 (11th Cir.1999). Under section 1604 of the FSIA, unless a FSIA statutory exception to immunity applies, a foreign state is immune from the jurisdiction of federal or state courts. *Id.*; *see* 28 U.S.C. § 1604[1]; 28 U.S.C. § 1330(a).[2] As such, this Court only has subject matter jurisdiction in an action against a foreign state if one of the FSIA statutory exceptions to immunity applies. *Calzadilla v. Banco Latino Int'l*, 413 F.3d 1285, 1286 (11th Cir.2005) (affirming the dismissal of a case against arm of Venezuelan government for lack of subject matter jurisdiction). Accordingly, I must first determine whether this Court has subject matter jurisdiction over the Defendants based on one of the FSIA statutory exemptions.

Plaintiff asserts that the Court has subject matter jurisdiction in this case based on the exemption provided in 28 U.S.C. § 1605(a)(7).[3] In January 2008, after

---

1. 28 U.S.C. § 1604 provides, in its entirety:
 Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

2. 28 U.S.C. § 1330(a) provides, its entirety:
 The district courts shall have original jurisdiction without regard to amount of contro-

versy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claims for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605–1607 of this title or under any applicable international agreement.

3. Before it was repealed in January of 2008, 28 U.S.C. § 1605(a) provided:

Plaintiff filed her Motion for Default Judgment, Congress amended the statute and repealed § 1605(a)(7). Congress added a new section, 28 U.S.C. § 1605A [4], which

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—... (7) not otherwise covered by paragraph (2), in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph—

(A) if the foreign state was not designated as a state sponsor of terrorism under section 60(j) of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 1271) at the time the act occurred, unless later so designated as a result of such act or the act is related to Case Number 1:00CV03110(ESG) in the United States District Court for the District of Columbia; and

(B) even if the foreign state is or was so designated, if—

(i) the act occurred in the foreign state against which the claim has been brought and the claimant has not afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration; or

(ii) neither the claimant nor the victim was a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred.

4. 28 U.S.C. § 1605A provides, in relevant part:

(a) In general.—

(1) No immunity.—A foreign state shall not be immune from the jurisdiction of the courts of the United States or the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

(2) Claim heard.—The court shall hear a claim under this section if—

(A)(i)(*l*) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred, or was so designated as a result of such act, and, subject to subclause (II), either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section; or

(II) in the case of an action that is refiled under this section ... or is filed under this section by reason of section 1083(c)(3) of [the National Defense Authorization Act for Fiscal Year 2008], the foreign state was designated as a state sponsor of terrorism when the original action or the related action under 1605(a)(7) ... was filed.

(ii) the claimant or the victim was, at the time the act described in paragraph (1) occurred—

(I) a national of the United States;

(II) a member of the armed forces;

(III) otherwise an employee of the Government of the United States ...; and

(iii) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration ...

(c) Private right of action.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(*l*), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—

(1) a national of the United States ... for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money

includes much of the same language and expands upon the now-repealed § 1605(a)(7).

■ Although this case was brought pursuant to the now-repealed § 1605(a)(7), I may retain jurisdiction pursuant to § 1605(a)(7) because this case was pending under that section when Congress enacted the law which repealed § 1605(a)(7) and added § 1605A. *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C.Cir.2008) ("Therefore, the plaintiff in a case pending under § 1605(a)(7) may not maintain that action based upon the jurisdiction conferred by § 1605A; in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision .... we hold the courts retain jurisdiction pursuant to § 1605(a)(7) over cases that were pending under that section when the Congress enacted the NDAA.") As such, I analyze whether this Court has jurisdiction over Plaintiffs' claims pursuant to § 1605(a)(7).

A. *This Court has jurisdiction under 28 U.S.C. § 1605(a)(7)*

■ Pursuant to § 1605(a)(7), a foreign state is not entitled to sovereign immunity for claims where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for

such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency...." 28 U.S.C. § 1605(a)(7). Three additional elements must also be satisfied in order for a court to have jurisdiction over a claim under § 1605(a)(7): (1) the foreign state must have been designated a "state sponsor of terrorism" at the time of the act; (2) the foreign state must have been given a reasonable opportunity to arbitrate the claim; and (3) the claimant or victim must have been a United States national when the act occurred. I first address these three additional elements.

1. *Cuba was designated a state sponsor of terrorism*

■ First, Cuba must have been designated as a state sponsor of terrorism at the time of the act. This element is satisfied because the United States had designated Cuba as a state sponsor of terrorism at the time of the Mr. Saludes arrest and continuing imprisonment. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C.Cir.2004) (noted that a 1995 Report by the House of Representatives identified Libya, Iraq, Iran, Syria, North Korea, Cuba, and Sudan as state sponsors of terrorism) (citing H.R.Rep. No. 104–383, at 62 (1995)); *Ale-*

---

damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents ....

(h) Definitions.—For purposes of this section— ...

(5) the term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22));

(6) the term "state sponsor of terrorism" means a country the government of which

the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780) or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism; and

(7) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section 3 of the Torture Victims Protection Act of 1991 (28 U.S.C. 1350 note).

*jandre,* 996 F.Supp. at 1248 (noting that Cuba was designated as a state sponsor of terrorism).

### 2. *Cuba had a reasonable opportunity to arbitrate*

Second, the foreign state must have been given a reasonable opportunity to arbitrate the claim. Here, Plaintiff Olivia Saludes has shown that Plaintiffs offered Defendants reasonable opportunity to arbitrate the claims in this case. Plaintiffs served Defendants Republica de Cuba and the Partido Comuninsta de Cuba in 2004, with the Amended Complaint as shown by the Certificate of Effectiveness of Service required by 28 U.S.C. § 1608(a). Given that Defendants have failed to respond to the Complaint or otherwise appear in this action since 2004, and given Defendants refusal to communicate with Plaintiff Olivia Saludes as reflected in her affidavit, I conclude that Defendants had a reasonable opportunity to arbitrate their claims.

### 3. *Plaintiff Olivia Saludes is a national of the United States*

Third, the claimant or victim must have been a United States national, as defined in section 101(a)(22) of the Immigration and Nationality Act, when the act upon which the claim is based occurred. Here, Olivia Saludes has moved for default judgment on her claim of intentional infliction of emotional distress, and the acts by Defendants which have given rise to this claim began in 2003 and have continued into the present. Plaintiff Olivia Saludes has resided in the United States since June 28, 2000, and she applied for United States citizenship in June of 2007. Aff., Olivia Saludes [DE 50–2], at ¶¶ 3, 15, Ex. A. She attested in her affidavit that she has owed allegiance to the United States since 2000. *Id.* at ¶ 15.

▪ Section 101(a)(22) of the Immigration and Nationality Act provides that a

"national of the United States" is either "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). Because Plaintiff Olivia Saludes has resided in the United States since 2000, applied for United States citizenship in June of 2007, and sworn that she has owed allegiance to the United States since 2000, I conclude that Plaintiff Olivia Saludes has demonstrated that she owes permanent allegiance to the United States. As such, Plaintiff Olivia Saludes is currently a national of the United States as defined in section 101(a)(22) of the Immigration and Nationality Act. In addition, based on the length of time that she had resided in the United States, the statements in her affidavit, and her subsequent application for United States citizenship as soon as the seven-year statutory period had been fulfilled, I further conclude that Plaintiff Olivia Saludes was a national of the United States in 2003 at the time of her son's arrest and initial detention. Therefore, this third element is met.

Next, in order to determine whether the Defendants are exempt from immunity based on § 1605(a)(7), I must determine whether Plaintiff Olivia Saludes is seeking money damages "against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency...." 28 U.S.C. § 1605(a)(7).

### 4. *Defendants are foreign states*

Plaintiff Olivia Saludes requests that default judgment be entered against both the

Republica de Cuba and the Partido Comunista de Cuba. As discussed previously, the Republica de Cuba ("Cuba") has been designated a state sponsor of terrorism and is a foreign state. Under the FSIA, a "foreign state" is defined to include both a "political subdivision of a foreign state or an agency or instrumentality of a foreign state ..." 28 U.S.C. § 1603(a). The statute further defines an agency or instrumentality of a foreign state to be any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

 Based on this definition, the Partido Comunista de Cuba, or the Communist Party of Cuba, is an agency or instrumentality of Cuba. *See Chen v. China Central Television*, 2007 WL 2298360, *4, *6 (S.D.N.Y.2007) (holding that state-owned television station was an instrumentality of a foreign state because it was the "mouthpiece" of the Chinese Communist Party); *Hernandez–Caballero v. United States Attorney General*, 250 Fed.Appx. 275, 278 (11th Cir.2007) ("[Plaintiff], however, did not dispute that the Cuban Communist Party controls the government of Cuba.")

5. *Plaintiff seeks damages for personal injury caused by an act of torture*

Here, Plaintiff Olivia Saludes requests default judgment on her claim for intentional infliction of emotional distress based on her son Omar Rodriguez Saludes' imprisonment and treatment by Defendants. According to courts within the D.C. Circuit[5], a plaintiff seeking to lift a foreign state's sovereign immunity under § 1605(a)(7) may base her claim on the common law tort of a intentional emotional distress, and courts could look to state common law to determine the meaning of

---

**5.** The D.C. Circuit is the only circuit in which the courts have extensively addressed claims against a foreign state under 28 U.S.C. § 1605(a)(7) for intentional infliction of emotional distress. The Eleventh Circuit has not yet ruled on these issues, and I conclude that the Eleventh Circuit would most likely follow the reasoning articulated by the D.C. Circuit and its District Courts. The few rulings from other circuit and district courts on these types of claims do not conflict with the law of the D.C. Circuit on the matters addressed here. *See In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 75 (2d Cir.2008) (upholding dismissal of claims because defendants had not been designated as state sponsors of terrorism and were not subject to any other exception to the FSIA); *Rux v. Republic of Sudan*, 2005 WL 2086202 (E.D.Va. Aug.26, 2005) (denying motion to dismiss and reserving on whether plaintiffs had stated a claim for wrongful death, intentional infliction of emotional distress, battery, and loss of solati-

um where plaintiffs brought claims based on family members' deaths from bombing of the USS Cole); *In re Terrorist Attacks on September 11, 2001*, 349 F.Supp.2d 765, 830 (S.D.N.Y.2005) (stating that "[t]he Court finds that if the Ashton and Burnett Plaintiffs' allegations sufficiently allege that Defendants supported, aided and abetted, or conspired with the September 11, 2001 terrorists, they will have also stated a claim for intentional infliction of emotional distress" and granting and denying motions to dismiss); *Moses v. Air Afrique*, 2000 WL 306853, *4–*5 (E.D.N.Y. March 21, 2000) (dismissing claims because plaintiff did not provide any evidence in support of the state sponsor of terrorism exception, or prove the applicability of another exception to the FSIA); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F.Supp. 325, 331 (E.D.N.Y.1998) (denying motion to dismiss and holding that court had jurisdiction to consider plaintiff's intentional emotion distress claim).

an intentional infliction of emotional distress claim. *Kilburn v. Republic of Iran,* 277 F.Supp.2d 24, 35–36 (D.D.C.2003); *see Price v. Socialist People's Libyan Arab Jamahiriya,* 384 F.Supp.2d 120, 133–134 (D.D.C.2005) (holding that defendants were liable for intentional emotional distress based on the state law of California and Texas, where plaintiffs resided, where plaintiffs were mentally and physically tortured and imprisoned for 105 days). In addition, a plaintiff's claim for intentional emotional distress against a foreign state can be based on the torture of an immediate family member who was not present at the time. *See Bakhtiar v. Islamic Republic of Iran,* 2008 WL 2756606,*5 (D.D.C. July 17, 2008) (stating that "[c]ourts in this district have consistently held that a terrorist attack—by its nature—is directed not only at the victims but also at the victim's families" and concluding that plaintiffs, the wife and son of decedent, had stated a claim for intentional emotional distress based on the killing of decedent); *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 271 (D.D.C.2003) (determining that defendants were liable for intentional infliction of emotional distress on plaintiffs who were immediate family members of those injured in bombing but who were not present at the bombing); *Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27, 49–50 (D.D.C. 2001) (holding that defendants were liable for intentional emotional distress of plaintiffs who did not witness terrorist act but whose immediate family members did).

■ The treatment and incarceration of Omar Rodriguez Saludes qualifies as torture. Based on the affidavits submitted, he was arrested and incarcerated without being informed of any criminal charges, and he was summarily tried and convicted of a 27–year sentence based, presumably, on his journalistic activities. While in prison, he has been deprived of clean water, decent food, and even the most basic healthcare, even though Mr. Saludes has been diagnosed with serious health problems. Mr. Saludes has been beaten, starved, forced to live in unsanitary conditions in prison, and has at times been in solitary confinement for months at a time. Based on the evidence submitted, I find that Mr. Saludes' treatment and incarceration falls within the definition of torture. *See Price,* 384 F.Supp.2d at 132 ("The severe, coercive mistreatment to which they were subjected during their incarceration falls squarely within the definition of torture.")

■ Because Plaintiff Olivia Saludes is a resident of Florida, I apply Florida law on Plaintiff's claim for intentional infliction of emotional distress. *Id.* at 133–134. For a claim for intentional infliction of emotional distress under Florida law, a plaintiff must prove: "(1) the wrongdoer's conduct was deliberate or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community; (3) the conduct caused emotional distress; and (4) the emotional distress was severe." *Samedi v. Miami–Dade County,* 134 F.Supp.2d 1320, 1353–1354 (S.D.Fla.2001); *see also Gallogly v. Rodriguez,* 970 So.2d 470, 471 (Fla. 2d DCA 2007); *Hart v. United States,* 894 F.2d 1539, 1548 (11th Cir.1990).

■ Based on the affidavits submitted, I find that there is sufficient evidence to show that Defendants deliberately or recklessly caused Plaintiff Olivia Saludes to experience emotional distress, and I find that the Defendants conduct was outrageous. As discussed above, the treatment and imprisonment of Plaintiff Olivia Saludes' son falls within the definition of torture, Defendants have refused to allow

Plaintiff Olivia Saludes to communicate with her son by phone or in person, and Defendants have refused to communicate with Plaintiff Olivia Saludes about her son and his ongoing imprisonment.

According to the affidavits, Plaintiff Olivia Saludes has developed a number of health problems due to the her son's treatment and incarceration. She has experienced insomnia and constant nightmares since her son was imprisoned. Aff., Miguel Saludes Garcia [DE 50-3] at ¶ 26. Plaintiff Olivia Saludes has developed diabetes, and her feet have shown signs of deterioration. *Id.;* Aff., Olivia Saludes [DE 50-2] at ¶ 14. She has also developed a pulmonary condition. Because of these health problems, Plaintiff Olivia Saludes was compelled to resign from her job and has been unable to work since her resignation. *Id.* She subsequently lost her Medicare benefits and has been forced to live on assistance from her family. *Id.* Based on these affidavits, I find that the Defendants' conduct caused Plaintiff Olivia Saludes to experience severe emotional distress. Therefore, I conclude that Plaintiff has submitted sufficient evidence to support her claim for intentional emotional distress under Florida law.

As stated in the Amended Complaint, Plaintiff Olivia Saludes seeks compensatory and punitive damages against Defendants. Am. Compl. at p. 20. As such, Plaintiff has established the requisite elements for her claim against Defendants.

Therefore, I conclude that Defendants Republica de Cuba and the Partido Comunista de Cuba are exempt from immunity based on § 1605(a)(7), and that Plaintiff Olivia Saludes has established her claim or right to relief for intentional infliction of emotional distress by evidence that is satisfactory to the Court. *See Alejandre,* 996 F.Supp. at 1242

### B. *Amount of damages to be awarded*

In order to recover damages, a plaintiff who prevails on default under the Foreign Sovereign Immunities Act "must prove damages in the same manner and to the same extent as any other default winner." *Campuzano,* 281 F.Supp.2d at 272. A plaintiff must therefore prove the amount of damages by a reasonable estimate, and a plaintiff must prove future damages to a reasonable certainty or by a preponderance of the evidence. *Id.* In addition, the Court "should consider any special problems of proof arising from the defendant's absence." *Id.*

Although Plaintiff has submitted affidavits in support of her Motion for Default Judgment, Plaintiff has not submitted any sworn statements or other evidence to show the amount of her damages for her intentional infliction of emotional distress claim. In the Motion, Plaintiff represented that she would be filing an expert report as a supplement to the Motion, but no expert report has yet been filed. Therefore, Plaintiff shall submit affidavits or other evidence to show the amount of her damages within 30 days of the docketing of this order. Accordingly, it is hereby

ORDERED AND ADJUDGED that

1. The Motion [DE 50] is GRANTED in part.

2. Plaintiff Olivia Saludes shall submit affidavits or other evidence to prove the amount of her damages within 30 days of the docketing of this order.

3. I reserve to address the amount of damages to be awarded on default judgment.